**Gregory O'Neil LOVE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–05–00452–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

June 15, 2006.

Robert Morrow, Hocker & Morrow, Boyd & Mathews, Spring, for Appellant.

Charles A. Rosenthal, Jr., Dist. Atty.–Harris County, Carmen C. Mitchell, Asst. Dist. Atty., Houston, for Appellee.

Panel consists of Justices KEYES, ALCALA, and BLAND.

## OPINION

JANE BLAND, Justice.

Appellant Gregory O'Neil Love pleaded not guilty to the felony offense of capital murder. A jury found Love guilty. As the State did not seek the death penalty, the trial court sentenced Love to life imprisonment. In three issues, Love contends (1) the evidence is legally and factually insufficient to demonstrate that he intended to aid in the offense of capital murder, (2) the trial court erred in failing to charge the jury on the defense of renunciation, and (3) the trial court erred in admitting improper victim impact evidence during the guilt-innocence phase of trial. We conclude that legally and factually sufficient evidence supports the conviction and that the trial court did not abuse its discretion in charging the jury or admitting the evidence in question. We therefore affirm.

### Facts

In May 2003, Love worked as a night manager of a Whataburger in northwest Houston. One night, Gerald Marshall, with whom Love previously had worked at a Popeye's restaurant, visited the Whataburger. Derrel McQueen, who occupied the car with Marshall, testified that Love stood outside the Whataburger, hosing down the parking lot. Marshall recognized Love, and exited the car to speak with him. Tony Ketchum, a Whataburger employee on duty that night, testified that Love recognized one of the men in a car that pulled up to the drive-through window, and went outside to speak to him.

McQueen testified that he overheard Love tell Marshall that he should return to the restaurant to commit a robbery on a night while Love worked, at around three or four o'clock in the morning. Love told Marshall to enter the store by climbing through the drive-through window, and Love would pretend as though they did not know each other and would give Marshall money. McQueen further testified that Love told Marshall that, if someone was working besides Love, not to let that person tell him that he did not have keys or know how to open the safe, because that person could open the safe. Love gave Marshall his telephone number and some free food, and Marshall and McQueen left. Marshall's girlfriend, Tamara Woods, testified that she saw Marshall with a napkin bearing the name "Greg" and a telephone number. Marshall told her that he knew a manager at a Whataburger who was going to help him rob the store.

After talking with Marshall, Love told several employees that the men he had been talking to outside had guns and were attempting to rob someone at the restaurant, but that he knew one of the men and was able to convince them not to rob anyone. Several Whataburger employees testified that Love had mentioned this foiled robbery to them, and Ketchum testified that when he came to work the next day, everyone was talking about it. One em-

ployee testified that Love told everyone to be careful in case the robbers attempted to rob someone at the restaurant again. Davilyn Spencer, the general manager, testified that Love explained the incident to her as a food complaint, not an attempted robbery. She testified that he told her merely that some men were dissatisfied with their food and Love gave them free food to make them happy. Love never notified police or management of the attempted robbery.

On May 11, 2003, Love arrived early to his graveyard shift. Also on duty that night were Wilbert Marsh, Ketchum, Agnes, and Chris Dean. Dean was a mentally retarded employee who had worked for Whataburger for fourteen years. Dean was very dedicated to Whataburger, knew everything about the restaurant, and had worked at every position except team leader or manager. Though Love was scheduled to work from 11:00 p.m. to 7:00 a.m., he arrived early, around 9:00 p.m. Arthur Miller, the manager scheduled to work from 3:00 p.m. to 11:00 p.m., was on duty when Love arrived. Miller asked Love if he could leave early since Love had arrived, and Love agreed. Before Miller left, he counted the money in the safe, but he and Love agreed that Love would count the money that had accumulated in the registers during the 3:00 p.m. to 11:00 p.m. shift. Miller testified that company policy provided for money to be counted and placed in the store safe at the end of every shift, but that occasionally managers would agree to count the money from someone else's shift. The general and area managers of the Whataburger testified that it was important for the manager on duty to "count down" the cash registers at the end of a shift to ensure that a minimum amount of cash would be available on the floor in the event of a robbery.

Telephone records established that Love called Marshall from his cell phone around 9:45 p.m., and around 10:00 p.m. Marshall called Love. Miller testified that about ten or fifteen minutes after he left the Whataburger, his wife telephoned him, reporting that Love had called Miller's house to say that Love needed to leave work because his brother had been shot. Miller and Love then had a telephone conversation in which Love told Miller he needed to leave work and asked if he could leave Dean in charge of the restaurant. Miller told Love that Dean had run the restaurant before, but that he had not done so since the new general manager, Spencer, had taken over, because Dean was not a team leader. Miller and Spencer both testified that a manager or team leader was supposed to be in charge of the restaurant at all times, and that Dean should not have been left in charge because he was not a team leader. Dean wanted to be a team leader but was unable to pass the written test. Miller and Spencer also testified that the proper procedure in such a situation would be to notify the general manager or area manager if a family emergency arose and obtain approval to leave. Miller further testified that if Love had asked him to return to the restaurant to work that evening, he would have done so.

Love did not ask Miller to return, but instead left Dean in charge of the restaurant without permission from the general or area managers. Marsh, a cook working at the Whataburger that night, testified that Love asked Agnes to stay late so he could leave. Love left the store around 11:30 p.m., leaving Dean, Marsh, Agnes, and Ketchum alone at the restaurant. Marsh and Ketchum both testified that Agnes stayed at the Whataburger until about 2:00 a.m. to cover for Love, though her shift had been scheduled to end at 11:00 p.m. Love did not count the money in the cash registers or deposit any money

in the safe or lockboxes before he left, thus leaving the maximum amount of cash in the registers. Love also left $125 in petty cash outside the safe in case Dean needed to make change for large bills. Spencer testified that there would have been about $1,600 in the registers that night before Love left.

After Love left, Dean discovered that Love had not counted the money in the registers. Although it was not his responsibility, Dean took it upon himself to count the money in the registers and deposit the excess in the lockboxes. In addition, Dean called Love several times to inquire when he would be returning to the restaurant, and several witnesses testified that Love said he would be returning to work. Love never returned to the restaurant that night.

At around 4:00 a.m., three men came through the drive-through and placed an order. When the men arrived at the drive-through window, Dean leaned out the window to tell them he did not understand their order. At that point, one of the men grabbed Dean by his shirt collar, pointed a gun at Dean's head, and told him it was a stickup. The man, later identified as Marshall, entered the restaurant by climbing through the window. Marsh, who was standing nearest to Dean making a hamburger, ran and hid in the storage area near the back door of the restaurant. Ketchum hid in the freezer. Marshall then chased Dean to the back of the restaurant where he demanded that Dean give him the key to the safe. Marsh testified that Marshall told Dean three times that if he did not give him the key to the safe he would shoot him. Dean did not have the key to the safe because the safe could only be opened by combination, but he did have a key to the lockboxes. After Dean failed to produce the key, Marshall shot him in the face and fled the scene.

Marsh testified that he waited about fifteen minutes and then called the police.

The next morning, Spencer, Miller, and other employees of the Whataburger arrived at the restaurant and waited outside while the police finished investigating the scene. Love was the only Whataburger employee who did not appear. When Spencer re-entered the restaurant, she counted the money in the safe, and discovered that only the $125 in petty cash that Love had left for Dean to use in making change was missing. Love arrived for work that evening, and collected his payroll check the following day. While he was there, Spencer asked him about the missing petty cash. Spencer and Miller both testified that Love went into the office and showed them that the petty cash was on a shelf above the computer. Both testified that the money was not on the shelf when they searched the office upon re-entering the restaurant after Dean's murder.

A Crimestoppers tip later identified Marshall and Ronald Worthy as the men who robbed the Whataburger. Kenny Calliham, who drove the getaway car the night of the robbery, turned himself in. Calliham testified that he was unaware of the plan to rob the Whataburger until they arrived at the restaurant and Marshall pulled a gun. Calliham testified that no one mentioned Love's name to him. When investigators approached Love, he admitted that his brother had not been shot the evening before the murder, but stated that he left work that night because he was having marital problems. Love's stepbrother testified that he had invited Love to go to a club that night, and that was the reason Love left work early.

### Legal and Factual Sufficiency

In his first issue, Love contends the evidence is legally and factually insufficient to demonstrate that he intended to

aid in the offense of capital murder. Love concedes on appeal that the evidence is sufficient to support a conviction as a party to aggravated robbery; thus, his sole challenge is to the sufficiency of the evidence that he intended, or should have anticipated, that a murder would be committed as part of the aggravated robbery.

When evaluating the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 .S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Drichas v. State,* 175 S.W.3d 795, 798 (Tex.Crim.App.2005). When evaluating factual sufficiency, we consider all the evidence in a neutral light to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Zuniga v. State,* 144 S.W.3d 477, 484 (Tex. Crim.App.2004). Evidence may be insufficient if, considered alone, it is too weak to support the verdict, or if, weighing all the evidence, the contrary evidence is strong enough that the beyond-a-reasonable-doubt standard could not have been met. *Id.* at 484–85. In conducting such a review, we consider all of the evidence weighed by the jury, comparing the evidence that tends to prove the existence of the elemental fact in dispute to the evidence that tends to disprove it. *Vodochodsky v. State,* 158 S.W.3d 502, 510 (Tex. Crim.App.2005). We are authorized to disagree with the jury's determination even if probative evidence exists to support the verdict, but we must avoid substituting our judgment for that of the factfinder. *Id.* In conducting such a review, we consider the most important evidence that the appellant claims undermines the jury's verdict. *Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim.App.2003). Under either review, the fact-finder is the exclusive judge of the witnesses' credibility and the weight to be given to their testimony. *Jones v. State,* 944 S.W.2d 642, 647–48 (Tex.Crim.App.1996).

■■■ A person commits capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit robbery. Tex. Pen. Code Ann. §§ 19.02(b)(1), 19.03(a)(2) (Vernon 2003 & Supp.2005). It is undisputed that Love was not present during the commission of the offense, so he is guilty, if at all, as a party to the offense. Under the law of parties, the jury could have found Love guilty by concluding that either: (1) under Penal Code section 7.02(a), acting with intent to promote or assist the commission of the murder, Love solicited, encouraged, directed, aided, or attempted to aid another person to commit the murder; or (2) under section 7.02(b), the murder was committed in an attempt to carry out a conspiracy to commit robbery, and, though Love had no intent to commit the murder, it was committed in furtherance of the unlawful purpose and should have been anticipated as a result of the carrying out of the conspiracy. *See id.* § 7.02(a), (b) (Vernon 2003); *see also Tippitt v. State,* 41 S.W.3d 316, 323 (Tex.App.-Fort Worth 2001, no pet.). "In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Ransom v. State,* 920 S.W.2d 288, 302 (Tex.Crim.App.1994). A defendant in a capital murder case may be convicted solely on a conspiracy theory of culpability contained in the jury charge. *Fuller v. State,* 827 S.W.2d 919, 932–33 (Tex.Crim. App.1992).

■ Here, the evidence is sufficient to support Love's conviction under section 7.02(b) of the Penal Code because the evidence supports a finding that Love should have anticipated the possibility of a murder resulting from the course of committing this robbery. Love concedes the evidence is sufficient to establish that he was part of a conspiracy to commit robbery at the Whataburger, so the conspiracy to commit a felony requirement of section 7.02(b) is satisfied. In addition, Love does not challenge that the murder was committed in furtherance of the robbery; thus, we need only consider whether the evidence is sufficient to demonstrate that Love should have anticipated a murder occurring in the course of the robbery. According to McQueen, Love told Marshall that, if Love was not present when he arrived at the Whataburger to carry out the robbery, Marshall should not "believe" anyone who told him that the employee in charge did not have keys to the safe, because that person would have keys. Police recovered keys to the lockbox on Dean's body after the robbery, and the area manager testified that Dean might not have made the connection that the keys to the lockbox, which he possessed, could have satisfied the robber's request for keys to the safe. The evidence further shows that Love knew that these robbers likely would carry guns from his statement to his fellow employees earlier that month that they should be careful if these men returned to rob someone at Whataburger because they carried guns. A jury could infer from Love's statement that he anticipated, or should have anticipated, the possibility that Marshall might resort to firing a gun if the person in charge claimed not to be able to open the safe.

Love contends under *Tippitt v. State* that unless a defendant knows his co-conspirators have guns, the evidence may be insufficient to demonstrate that he should have anticipated murder as a result of carrying out the underlying felony. 41 S.W.3d at 323. Here, however, the evidence demonstrates that Love had some knowledge that his co-conspirators would use guns in the course of the robbery. Several Whataburger employees testified that, when Love explained the purported thwarted robbery attempt, he stated that the would-be robbers had guns. Ketchum testified that he was working the night of the foiled robbery, and when Love told the story immediately after it happened, he told Ketchum the men had "guns." Another Whataburger employee testified that Love told employees to be careful after the thwarted robbery attempt, because the would-be robbers had guns and might try to rob someone at the restaurant again. Evidence that a defendant knew his co-conspirators might use guns in the course of the robbery can be sufficient to demonstrate that the defendant should have anticipated the possibility of murder occurring during the course of the robbery.[1]

---

1. *See Holiday v. State*, 14 S.W.3d 784, 789–90 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd) (holding that jury can reasonably infer intent to kill from use of deadly weapon); *see also Green v. State*, 682 S.W.2d 271, 285–86 (Tex. Crim.App.1984) (holding murder should have been anticipated as possible result of robbery where appellant admitted entering house armed with gun); *Ruiz v. State*, 579 S.W.2d 206, 209 (Tex.Crim.App. [Panel Op.] 1979) (holding direct evidence of appellant's participation in aggravated robbery in concert with other individuals while brandishing deadly weapon would permit jury to infer that murder should have been anticipated as result); *Williams v. State*, 974 S.W.2d 324, 330 (Tex. App.-San Antonio 1998, pet. ref'd) (holding evidence sufficient that murder committed in course of pawn shop robbery was foreseeable to appellant where evidence showed at least one of five conspirators arrived at scene armed with gun, there was testimony by accomplice witness that four of five conspirators left apartment with weapons, and there was

We therefore hold that the jury reasonably could have concluded that Love should have reasonably anticipated the possibility of a murder occurring in the course of the robbery.

In addition, several employees and Dean's mother testified that Dean could get flustered in out-of-the-ordinary situations. It was common knowledge among Whataburger employees that Dean had a mental impairment, that he loved his job, and that he was very protective of the Whataburger where he worked. Love's knowledge of Dean's impairment and feelings toward Whataburger suggests that, in telling Marshall not to "believe" an employee who claimed not to have keys, Love anticipated that Dean might try to protect the restaurant by refusing access to the money. Based on Love's statements to Marshall, his knowledge that the robbers might use guns, and his knowledge of Dean's mental impairment and loyalty toward Whataburger, we hold the evidence is legally sufficient to support Love's conviction under section 7.02(b). TEX. PEN. CODE ANN. § 7.02(b).

 We further conclude that, viewing the evidence in a neutral light, the evidence of guilt is not so weak, nor the contrary evidence so strong, that the beyond-a-reasonable doubt standard could not have been met. In support of his factual insufficiency argument, Love points to evidence that he attempted to make the robbery go as smoothly as possible by leaving the maximum amount of money out of the safe, thus indicating that he did not anticipate that a murder would occur. He also contends the evidence that he left the restaurant on the night of the robbery, though he had agreed with Marshall that he would be present during the robbery, indicates an attempt to back out of the robbery. However, the mere existence of a reasonable alternative hypothesis does not render the evidence factually insufficient. *Richardson v. State*, 973 S.W.2d 384, 387 (Tex.App.-Dallas 1998, no pet.). Evidence that Love had a phone conversation with Marshall shortly before he left the restaurant, and that he did not lock up the money, or warn the employees of the robbery, indicates a desire that his co-conspirators carry out the robbery. Further, Love's knowledge that Marshall might use a gun in committing the offense, combined with his statement to Marshall not to let the person in charge of the restaurant say he did not have a key to the safe, and his knowledge of Dean's protective feelings toward Whataburger, indicate that he should have anticipated the possibility of a murder.

We note that the Court of Criminal Appeals recently overturned a capital murder conviction for factual insufficiency in *Vodochodsky v. State*, and conclude that this case is distinguishable. 158 S.W.3d 502, 511 (Tex.Crim.App.2005). There, the defendant was convicted of capital murder and sentenced to death for helping his roommate carry out a plan to commit suicide by engaging police in a deadly shootout. *Id.* at 504. The court concluded the evidence was factually insufficient despite

evidence that bullets or casings from two different guns were recovered from scene); *Coleman v. State*, 956 S.W.2d 98, 102 (Tex. App.-Tyler 1997, pet. ref'd) (holding evidence sufficient to support finding that appellant should have anticipated murder as result of conspiracy to commit carjacking where evidence showed that, just prior to subject offense, confederate unsuccessfully tried to carjack another vehicle in appellant's presence by wielding .45 caliber pistol, confederate announced he was going to get victim's car, and after following victim home, confederate armed himself with .45 caliber pistol, appellant armed himself with sawed-off shotgun, appellant admitted having knowledge of weapons in car, and appellant admitted supplying shotgun).

evidence that Vodochodsky knew about his roommate's plan and bailed him out of jail so he could carry out the plan, because none of the evidence directly indicated that Vodochodsky intended to help his roommate kill police officers, and contrary evidence indicated Vodochodsky did not wish to participate in the plan. *Id.* at 510–11. The trial court charged the jury in Vodochodsky's case under section 7.02(a), such that it could find Vodochodsky guilty only if he had the specific intent to promote or assist his roommate in carrying out a capital murder. *Id.* at 509. The Court of Criminal Appeals concluded that the evidence was factually insufficient to demonstrate that Vodochodsky intended to assist his roommate in murdering police officers. *Id.* at 510. Here, the court charged the jury under section 7.02(b), which does not require a specific intent to commit murder, but only that the defendant should have anticipated murder occurring in the course of carrying out a robbery. *See Valle v. State,* 109 S.W.3d 500, 503–04 (Tex.Crim. App.2003) ("A defendant may be convicted of capital murder under § 7.02(b) without having the intent or actual anticipation that a human life would be taken that is required for an affirmative answer to the anti-parties issue.").

Thus, we conclude the evidence is legally and factually sufficient to support Love's conviction under section 7.02(b). Because the jury returned a general verdict, and because the evidence is both legally and factually sufficient to support a finding of guilt under section 7.02(b), we uphold the jury's verdict. *Rabbani v. State,* 847 S.W.2d 555, 558 (Tex.Crim.App.1992); *Cienfuegos v. State,* 113 S.W.3d 481, 490 (Tex.App.Houston [1st Dist.] 2003, pet. ref'd).

### Charge Error

In his second issue, Love contends the trial court erred in failing to charge the jury on the defense of renunciation under Penal Code section 15.04(b). TEX. PEN.CODE ANN. § 15.04(b) (Vernon 2003). Specifically, Love contends that he raised the defensive issue of renunciation with evidence that he warned the other Whataburger employees to be careful because his friend might try to commit robbery at the restaurant, and with evidence that he left the restaurant before the robbery. The State responds that the renunciation defense under Penal Code section 15.04(b) only applies to an offense of criminal conspiracy under section 15.02. *See id.* §§ 15.02, 15.04(b). We agree.

When reviewing jury charge error, we first determine if error actually exists in the jury charge and, if we find error, we determine whether it harmed the appellant. *See Ngo v. State,* 175 S.W.3d 738, 743 (Tex.Crim.App.2005). We review the trial court's decision not to include a defensive issue in the jury charge for an abuse of discretion. *See Wesbrook v. State,* 29 S.W.3d 103, 122 (Tex.Crim.App. 2000).

The Penal Code requires the trial court to include a jury instruction on any affirmative defense when the evidence supports that defense. *See* TEX. PEN.CODE ANN. § 2.04 (Vernon 2003). Once the trial court admits such evidence, the jury charge must contain the instruction. *See Arnold v. State,* 742 S.W.2d 10, 13 (Tex. Crim.App.1987). Penal Code section 15.04(b) establishes that

[i]t is an affirmative defense to prosecution under Section 15.02 or 15.03 that under circumstances manifesting a voluntary and complete renunciation of his criminal objective the actor countermanded his solicitation or withdrew from the conspiracy before commission of the object offense and took further

affirmative action that prevented the commission of the object offense.

Tex. Pen.Code Ann. § 15.04(b). Unless a defendant is charged under sections 15.02 or 15.03 of the Penal Code, the renunciation defense under section 15.04 does not apply. *See Wesbrook*, 29 S.W.3d at 122. Here, the State charged Love as a party under Penal Code section 7.02(b), not with the separate offense of conspiracy under section 15.02. *See* Tex. Pen.Code Ann. §§ 7.02(b), 15.02. Accordingly, we hold the trial court did not err in denying Love's request that the jury be charged on the renunciation defense under section 15.04(b).

### Victim Impact Evidence

In his third issue, Love contends the trial court abused its discretion by allowing impermissible victim impact testimony from Dean's mother during the guilt-innocence phase of the trial. The State responds first that Love failed to preserve this issue on appeal by failing to specify on the record which questions and answers he wanted excluded, and in the alternative that Dean's mother's testimony did not constitute victim impact evidence.

■ Before Dean's mother, Rose Barton, testified, Love objected that her testimony constituted victim impact testimony, and therefore was impermissible at the guilt-innocence phase of the trial. In addition, Love argued that other witnesses already had testified to Dean's mental status, and that Barton's testimony on the same issue was more prejudicial than probative. The State responded that it did not intend to elicit victim impact testimony, but rather intended to establish Dean's mental status and his loyalty to Whataburger, which the State argued had "everything to do with [Love] leaving [Dean] at the restaurant alone," knowing that he was impaired and would likely be protective of the restaurant. The court sustained Love's objection with regard to victim impact testimony, but allowed Barton to testify about Dean's mental capacity and loyalty to his employer. During Barton's testimony, Love requested and received a running objection. In addition, when the State asked Barton to describe Dean's burial clothes, the trial court sustained Love's objection that the testimony went to victim impact.

■ Texas law requires a party to continue to object each time inadmissible evidence is offered, except when defense counsel requests a running objection or objects out of the presence of the jury to all testimony he deems objectionable on a given subject. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex.Crim.App.2003); *Ross v. State*, 154 S.W.3d 804, 811 (Tex.App.Houston [14th Dist.] 2004, pet. ref'd). Here, Love requested both a hearing outside the presence of the jury and a running objection. We conclude that Love properly preserved this issue on appeal.

■ The State next contends the trial court did not err in admitting Barton's testimony because it does not constitute victim impact evidence. A trial court's ruling concerning the admission or exclusion of evidence may not be disturbed on appeal unless the trial court abuses its discretion. *Najar v. State*, 74 S.W.3d 82, 86 (Tex.App.-Waco 2002, no pet.). We ask whether the trial judge's decision lies "within the zone of reasonable disagreement." *Id.* In homicide cases, victim impact evidence is traditionally defined as "evidence concerning the effect that the victim's death will have on others, particularly the victim's family members." *Mathis v. State*, 67 S.W.3d 918, 928 (Tex.Crim. App.2002). Victim impact testimony is irrelevant at the guilt-innocence phase of a trial because it does not tend to make more or less probable the existence of any

fact of consequence with respect to guilt or innocence. *See Miller–El v. State,* 782 S.W.2d 892, 895 (Tex.Crim.App.1990); *Garrett v. State,* 815 S.W.2d 333, 337–38 (Tex.App.-Houston [1st Dist.] 1991, pet. ref'd).

■ Here, Barton's testimony did not relate to the effect Dean's death had on her, but instead related to his mental capacity and love for Whataburger, facts that the trial court reasonably could have determined are relevant to whether Love should have anticipated that a murder would result from the robbery. The trial court sustained Love's objection to any victim impact testimony. Barton then testified that her son was slow and had to be placed in special education classes from elementary school until his graduation from high school. She testified that he followed directions well in school, but was not scholastically equal to his peers, and he would sometimes become angry when he could not participate in the same activities as his brother. At that point, Love requested and received a running objection to her testimony. Barton then testified about Dean's work history, including how he came to work at Whataburger, how long he worked there, what he did there, and how much he enjoyed working there. She testified that Dean lived at home because she did not trust him living on his own, and that it worried her that Dean worked at night because he would get scared and "freeze up." Barton testified that Dean worked at Whataburger for fourteen years, working his way up from maintenance until he worked every position in the restaurant, and that he wanted very much to be a team leader but was unable to pass the written test. She testified that Dean loved Whataburger so much that he worked extra shifts on his days off, and wore his uniform everywhere, even to church. Barton testified that Dean loved

Whataburger so much that his thirty-fourth birthday cake was in the shape of a hamburger and french fries. When the State asked Barton to describe Dean's burial clothes, Love objected to victim impact, and the trial court sustained the objection. We conclude that the trial court did not abuse its discretion in allowing this testimony, insofar as it relates to Love's knowledge and state of mind before the robbery. *See Miller–El,* 782 S.W.2d at 895; *Petruccelli v. State,* 174 S.W.3d 761, 768 (Tex.App.-Waco 2005, pet. ref'd).

### Conclusion

We hold that (1) the evidence is legally and factually sufficient to support Love's conviction because the jury reasonably could have concluded that Love should have anticipated that a murder might occur in the course of committing the robbery, (2) the trial court did not err in failing to charge the jury on the defense of renunciation because that defense only applies to the offense of conspiracy under Penal Code section 15.02, and (3) the trial court did not err in allowing the testimony of Dean's mother because it did not constitute victim impact evidence. We affirm the judgment of the trial court.