Opinion issued March 1, 2007



















In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00134-CR

____________


RONALD LEE WORTHY, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 180th District Court

Harris County, Texas

Trial Court Cause No. 948721






MEMORANDUM OPINION

 A jury found appellant, Ronald Lee Worthy, guilty of the offense of capital
murder. (1) Because the State did not seek the death penalty, the trial court
automatically assessed his punishment at confinement for life. (2) In five points of
error, appellant contends that the evidence is legally and factually insufficient to
sustain his conviction for capital murder as a "party" (3) and as a "co-conspirator" (4) and
that his trial counsel rendered ineffective assistance of counsel.

 We affirm.

Factual Background


 Houston Police Homicide Investigator D.C. Lambright testified that on May
11, 2003, at approximately 5:00 a.m., he was dispatched to investigate a murder at a
Whataburger restaurant on West 18th Street. Upon his arrival, Lambright walked
through the crime scene, saw the body of the complainant, Christopher Dean, in the
back storage area in front of the rear exit door, and noted that his wound and the
blood pattern around his body indicated that a shooting had occurred. Lambright
explained that the presence of an overturned trash bin near the complainant's body
"indicate[d] that there was some type of struggle or scuffle that took place in that
area." Also, on the inside of the drive-through window, a box of straws was
overturned. Lambright recovered the complainant's headset outside of the drive-through window and his Whataburger ball cap in some bushes. Police officers also
recovered a key ring with several keys and a "single lone key" from the complainant
during the inventory of his body.

 Wilbert Marsh testified that on the morning of May 11, 2003, he and Tony
Ketchum were the cooks working the graveyard shift at the restaurant and Greg Love
was the manager that night. Approximately two to three hours before the complainant
was shot at the restaurant, Love told the Whataburger employees that his brother had
been shot and Love needed to leave. Although the complainant had never passed the
tests to act as manager, Love left the complainant in charge. The complainant then
took orders and collected money at the drive-through window. After Love left, the
complainant "called [Love] about three times and asked him how long he will be back
and he said he will be back soon." Marsh stated that Love never returned to the
restaurant. 

 Marsh explained that at the time of the shooting, the dining room of the
restaurant was closed and they were only serving customers through the drive-through window. Prior to the shooting, a car approached the window, and Marsh
thought he heard an order for a "Whataburger" and started to prepare the order. 
When the car stopped at the window, the complainant hung his head out of the
window and said, "I didn't get your order." Then, "[o]ut of the clear blue sky,"
someone came through the window, grabbed the complainant by his shirt, and pointed
a "shiny pistol" at his head. The complainant tried to get away, Marsh ran and "hid
behind some boxes," and Ketchum hid "inside a freezer." As he was hiding, Marsh
"could . . . see nothing in front of the store." Marsh explained that the complainant
was too large to fit through the drive-through window and that it was possible that the
complainant initially got away while the man who entered through the window was
letting another man inside the restaurant.

 While Marsh was hiding, the complainant made it out of the restaurant through
a back door. The man who entered through the window followed the complainant
and pushed the door "[a]bout four, five, six times" before it finally opened. About
five or six minutes later, Marsh heard people back inside the restaurant. Marsh
explained that it would have been possible for the complainant and the man to re-enter the restaurant if someone let them in from the inside. Once inside the
restaurant, the man told the complainant that if he did not give him the keys to the
safe, he was going to kill the complainant. The complainant told the man that he did
not have the keys to the safe, and the man shot the complainant. 

 Houston Police Homicide Investigator R. Moreno testified that by the end of
the day on May 11, 2003, police officers were suspicious of Love's activities leading
up to the robbery. Based on Moreno's investigation, he learned that Love did not
have a brother. Officer B. McDaniel was able to trace Love's whereabouts through
Love's use of his cellular phone. The officers received a tip from Crime Stoppers that
"an individual that went by the name of Bo and an individual by the name of Tank
had committed this crime." Moreno was able to establish that Tank was the actual
shooter. Police officers later identified appellant as "Bo," and Gerald Marshall as
"Tank." 

 After Marshall was taken into custody, Moreno received information that
Kenny Calliham was involved in the shooting and that he wanted to surrender to
authorities. Moreno then interviewed Calliham, and he learned that three men were
involved in the robbery and Calliham was the "getaway" driver. 

 Later, on the morning of May 14, 2003, after a warrant had been issued for his
arrest, appellant surrendered to police officers. Based on his investigation, Moreno
also learned that appellant gave Marshall the firearm that he used to kill the
complainant. Police officers also learned that Marshall and Love had previously
worked together at a Popeye's restaurant. Appellant told Moreno that he had been
with Marshall and Calliham at a convenience store prior to the shooting, he brought
Calliham into the robbery, and he told Calliham that he was going to get paid for his
involvement in the robbery. 

 Houston Police Homicide Investigator B. McDaniel testified that appellant told
him in a videotaped statement (5) that he had disposed of the firearm used in the
shooting in a bayou near the Northborough apartments. Although appellant initially
indicated that there was only one firearm used in the shooting, McDaniel explained
that appellant later told him that he "disposed of the guns, plural." Appellant initially
told McDaniel that they were "real guns," but later, in his statement, appellant said
that they were "fake guns." Appellant later admitted that he did not throw the guns
into the bayou and then led police officers to a dumpster at the apartment complex
where Marshall had been arrested. At the dumpster, appellant told McDaniel that he
had set his "plastic" gun on fire, melted it inside a metal pan on the pavement, and
then he threw the pan and residue into the dumpster. Appellant later told McDaniel
that he sold the guns to two gentlemen. Police officers never recovered any firearms. 
 Dennis John Meyer, an inmate in the Harris County Jail, testified that while in
the same jail cell, appellant and Calliham approached Meyer, asking for advice
concerning the instant case. Appellant and Calliham explained the facts of their case,
and Meyer told them "that as far as the law is concerned in Texas, that if there is [sic]
any defendants that are going to commit a crime, any type of felony and that when
there is a murder during that felony, that everybody, whether they are actually the
trigger puller or not, were culpable of the same charge." Appellant and Calliham then
asked Meyer to assist them in preparing affidavits concerning each other's
involvement. Meyer wrote the affidavits, purportedly authored by appellant and
Calliham, and gave the affidavits to appellant and Callihan to rewrite in their own
handwriting before being notarized. Appellant told Meyer that he was concerned that
he would be tried for capital murder, and Meyer told appellant that if he had "changed
his mind and didn't want to follow through with it, then possibly he wouldn't be
culpable." 

 Meyer further testified that appellant and Calliham told him that what actually
happened is that "[Marshall] went in through a little window, serving window and
[appellant] went around to the side door." Then, Marshall "opened the side door and
went back in," and "[appellant] walked in a little ways and stood there." After he
heard a gunshot, appellant "got scared and he turned around and walked out the door,
went to the car." Appellant told Meyer that he was inside the restaurant, wearing a
mask and holding a gun, when the shot was fired. Appellant also told Meyer that he
was the person who provided the guns for the robbery. It was also Meyer's belief that
Calliham knew beforehand that a robbery was going to take place. In exchange for
Meyer's testimony, the State agreed to a ten-year sentence in his pending burglary
case.

Sufficiency of the Evidence

 In his second and fourth points of error, appellant contends that the evidence
is legally and factually insufficient to sustain his conviction for capital murder as a
"co-conspirator." See Tex. Pen. Code Ann. § 7.02(b) (Vernon 2003). Appellant
concedes that the evidence is sufficient to support his conviction for aggravated
robbery; thus, his sole challenge is to the sufficiency of the evidence that he should
have anticipated that a murder would be committed as part of the aggravated robbery. 
See Love v. State, 199 S.W.3d 447, 452 (Tex. App.--Houston [1st Dist.] 2006, pet.
ref'd) (companion case).

 We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt. 
Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We note that
the trier of fact is the sole judge of the weight and credibility of the evidence. 
Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when
performing a legal sufficiency review, we may not re-evaluate the weight and
credibility of the evidence and substitute our judgment for that of the fact finder. 
Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any
inconsistencies in the evidence in favor of the verdict. Curry v. State, 30 S.W.3d 394,
406 (Tex. Crim. App. 2000).

 In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is so
obviously weak as to undermine confidence in the jury's determination, i.e., that the
jury's verdict seems "clearly wrong and manifestly unjust," or the proof of guilt,
although legally sufficient, is nevertheless against the great weight and preponderance
of the evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). 
In performing a factual sufficiency review, we are to give deference to the fact
finder's determinations, including determinations involving the credibility and
demeanor of witnesses. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). 
We may not substitute our judgment for the fact finder's. Watson, 204 S.W.3d at
414-15.

 A person commits the offense of capital murder if he intentionally commits
murder in the course of committing or attempting to commit robbery. Tex. Pen.
Code Ann. § 19.03(a)(2) (Vernon Supp. 2006). Under the law of parties, a person
is criminally responsible for the commission of an offense as a co-conspirator, if, in
the attempt to carry out a conspiracy to commit one felony, another felony is
committed by one of the conspirators, and though having no intent to commit it, the
offense was committed in furtherance of the unlawful purpose and was one that
should have been anticipated as a result of the conspiracy. Id. § 7.02(b). Therefore,
a jury could reasonably have found appellant guilty by concluding that a murder was
committed in an attempt to carry out a conspiracy to commit robbery and, though
appellant had no intent to commit the murder, it was committed in furtherance of the
unlawful purpose and should have been anticipated as a result of the carrying out of
the conspiracy. See id. In determining whether an accused participated as a party to
the offense, a court may look to events occurring before, during, and after the
commission of the offense and may rely on the accused's actions which show an
understanding and common design to do the prohibited act. Ransom v. State, 920
S.W.2d 288, 302 (Tex. Crim. App. 1994); Love, 199 S.W.3d at 452. A defendant in
a capital murder case may be convicted solely on a conspiracy theory of culpability
contained in the jury charge. Fuller v. State, 827 S.W.2d 919, 932-33 (Tex. Crim.
App. 1992); Love, 199 S.W.3d at 452.

 Appellant concedes that the evidence is sufficient to establish that he was part
of a conspiracy to commit a robbery at the restaurant, and thus the conspiracy to
commit a felony requirement of section 7.02(b) is satisfied. See Love, 199 S.W.3d
at 453. Also, appellant does not challenge that the murder was committed in
furtherance of the robbery; thus, we need only consider whether the evidence is
sufficient to prove that a murder should have been anticipated as a result of carrying
out the robbery. See id. 

 Here, appellant asserts that the only plan to which he "was a knowing party was
to commit a fake 'inside robbery' with Love's help that did not require, or
contemplate, the actual use of a firearm." However, appellant planned to rob the
restaurant and provided Marshall with the gun that he carried into the restaurant and
used to shoot the complainant. Even assuming that the robbery was to be a "fake
robbery," it was still conceivable that the plan should falter, things would go wrong,
and that a murder was possible. The fact that appellant provided a firearm to
Marshall indicates that he was aware of the dangerousness of the robbery. Based on
the evidence, the jury could have reasonably concluded that appellant anticipated, or
should have anticipated, the possibility that Marshall could resort to firing the gun
during the course of the robbery. It is well-established that evidence of a defendant's
knowledge that his co-conspirators might use guns in the course of a robbery is
sufficient to prove that the defendant should have anticipated the possibility of a
murder during the course of the robbery. See id.

 In support of his argument that the evidence is legally and factually insufficient
to support his conviction, appellant asserts that "robbery is not an offense of such an
inherently violent nature that murder should always be anticipated," citing Tippitt v.
State, 41 S.W.3d 316, 325-26 (Tex. App.--Fort Worth 2001, no pet.). However, in
Tippitt, the court noted that there was no evidence to show that the defendant knew
another suspect had a gun when he entered the victim's home. Id. The court
explained that without such evidence, it could not be proved that the defendant should
have anticipated a murder as a possible result of his agreement to rob the victim. See
id. at 326. Here, appellant admitted to providing Marshall with the gun that he used
to shoot the complainant during the robbery.

 Appellant also asserts that "there was no evidence that [he] should have
anticipated a murder because there was no evidence Marshall had a reputation for
violence or had engaged in other violent acts of which [appellant] had knowledge"
and "no other member of the conspiracy threatened to harm the customers or workers
at the Whataburger." However, knowledge of a co-conspirator's violent propensity
is not an element of the offense, "so the lack of evidence of such knowledge is not
dispositive of sufficiency." See Hooper v. State, No. PD-1352-05, 2007 WL 257633,
at *3 (Tex. Crim. App. Jan. 31, 2007). Moreover, the fact that appellant provided
Marshall with a weapon to assist in the robbery rationally leads to the conclusion that
a violent act was possible.

 Finally, appellant asserts that "[t]he fact that Marshall and . . . appellant arrived
at the scene in a car driven by Calliham when the original plan was still in effect and
left together after it had gone asunder provides no direct proof that [appellant] should
have anticipated [the complainant's] intentional death," and leads to an impermissible
type of inference stacking. However, the Court of Criminal Appeals recently clarified
that inference stacking "is not a part of our modern sufficiency review." See Hooper,
2007 WL 257633, at *4. Here, appellant actually provided Marshall with the gun that
he used to kill the complainant. Again, appellant's knowledge that a co-conspirator
would use a firearm in the course of the robbery sufficiently established that appellant
should have anticipated the possibility of a murder during the course of the robbery. 
See Love, 199 S.W.3d at 453.

 Viewing all the evidence in the light most favorable to the jury's verdict, we
conclude that a rational trier of fact could have found, beyond a reasonable doubt,
that appellant should have reasonably anticipated the possibility of a murder
occurring in the course of the robbery. Furthermore, viewing the evidence neutrally,
including appellant's assertions that the robbery was to be a "fake inside robbery,"
we conclude that the evidence is not so obviously weak such that the jury's verdict
seems "clearly wrong and manifestly unjust" or that the proof of guilt is against the
great weight and preponderance of the evidence. Accordingly, we hold that the
evidence is legally and factually sufficient to support appellant's conviction.

 We overrule appellant's second and fourth points of error. Having held that
the evidence is legally and factually sufficient to support appellant's conviction under
Texas Penal Code section 7.02(b), we need not address appellant's first and third
points of error, in which he contends that the evidence is legally and factually
insufficient to support his conviction as a party to the offense under Texas Penal
Code section 7.02(a)(2).

Ineffective Assistance

 In his fifth point of error, appellant argues that his trial counsel was ineffective
because he failed to object to irrelevant, inflammatory, and prejudicial victim
character and impact evidence that was offered at the guilt phase of his trial.

 The standard of review for evaluating claims of ineffective assistance of
counsel is set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052,
2064 (1984). Strickland requires a two-step analysis whereby appellant must show
both that (1) counsel's performance fell below an objective standard of
reasonableness, and (2) but for counsel's unprofessional error, there is a reasonable
probability that the result of the proceedings would have been different. Strickland,
466 U.S. at 687, 104 S. Ct. at 2064; Vasquez v. State, 830 S.W.2d 948, 949 (Tex.
Crim. App. 1992). Strickland defines reasonable probability as a "probability
sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at
2068. It is appellant's burden to prove ineffective assistance, and he must overcome
the strong presumption that, under the circumstances, the challenged action might be
considered sound trial strategy. Gamble v. State, 916 S.W.2d 92, 93 (Tex.
App.--Houston [1st Dist.] 1996, no pet.). Additionally, an ineffective assistance
claim must be "firmly founded in the record," and "the record must affirmatively
demonstrate" the meritorious nature of the claim. Thompson v. State, 9 S.W.3d 808,
813 (Tex. Crim. App. 1999). 

 Appellant complains that his trial counsel failed to object to the testimony of
the complainant's mother, Rose Dean Barton, that the complainant "was a good baby
and gave his mother no trouble"; the complainant was "developmentally delayed";
she "worried that the complainant would not be accepted at school"; doctors
recommended that the complainant "be institutionalized" and she did not
institutionalize the complainant "because she had seen how children were abused at
different orphanages, and she wanted to be a good mother and try to do it herself";
the complainant loved "all of his jobs, but he loved Whataburger the most"; the
complainant did not have the ability to drive a car; the complainant did not have the
ability to live on his own; the complainant's "biggest dream was to own, or manage
a Whataburger"; the complainant failed his test to become a team leader at
Whataburger on several occasions; the complainant "wore his Whataburger shirt
everywhere, even to church" and was buried in his Whataburger shirt; the
complainant, for Mother's Day, had bought her ruby-like earrings and a card the day
before he died; the complainant would send her cards for Easter, Mother's Day, her
birthday, and her anniversary; the complainant's thirty-fourth birthday party "had a
Whataburger theme that included a cake that looked like a hamburger and french
fries"; "one of the complainant's passions was wrestling" and he wore a wrestling
shirt in the picture taken of him with his Whataburger birthday cake; and the
complainant's brother had taken him to Seattle to see a wrestling match involving his
favorite wrestler. Appellant also complains about the testimony of the complainant's
mother that the complainant "didn't hurt nobody," "loved everybody no matter what,"
and she "love[s] him and miss[es] him a whole, whole lot."

 Here, appellant did not file a motion for new trial and nothing in the record
reveals his trial counsel's reasons for not objecting to the above evidence. In regard
to the testimony from the complainant's mother, the State asserts that such testimony
was not impermissible victim impact evidence because it does not concern the
physical, psychological, or economic effect of the crime on the victim's mother or his
family. In Matchett v. State, the Court of Criminal Appeals held that testimony from
a victim's wife that she and the victim had been married for twenty-five years, that
they had five children, and that the victim was home alone on the night of his murder,
together with photographs depicting her, her husband, and some of their friends was
not impermissible victim impact evidence. 941 S.W.2d 922, 931 (Tex. Crim. App.
1996). Here, appellant's trial counsel may have considered the complained of
testimony admissible or that an objection to such testimony would be futile. 
Additionally, we note that isolated failures to object to improper evidence generally
do not constitute ineffective assistance of counsel. Ingham v. State, 679 S.W.2d 503,
509 (Tex. Crim. App. 1984). Accordingly, we hold that appellant has not established
that his trial counsel's performance fell below an objective standard of
reasonableness. 

 We overrule appellant's fifth point of error.


Conclusion


 We affirm the judgment of the trial court.



 Terry Jennings

 Justice


Panel consists of Justices Nuchia, Jennings, and Higley.


Do not publish. Tex. R. App. P. 47.2(b).
1. See Tex. Pen. Code Ann. § 19.03(a)(2) (Vernon Supp. 2006).
2. See id. § 12.31 (Vernon Supp. 2006); Tex. Code Crim. Proc. Ann. art. 37.071, § 1
(Vernon 2006).
3. See Tex. Pen. Code Ann. § 7.02(a)(2) (Vernon 2003).
4. See id. § 7.02(b) (Vernon 2003).
5. Appellant's videotaped statement was admitted into evidence as State's Exhibit 46,
portions of which were played for the jury.