

## NUMBER 13-07-00094-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI ‑ EDINBURG

---

**CHRISDON DARNEL ALEXANDER,**                                                **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                **Appellee.**

---

### On appeal from the 351st District Court
### of Harris County, Texas

---

## MEMORANDUM OPINION

### Before Justices Yañez, Rodriguez, and Vela
### Memorandum Opinion by Justice Vela

A jury found appellant, Chrisdon Darnel Alexander, guilty of capital murder,[1] and the

trial court assessed punishment at life imprisonment.[2]   By three issues, appellant

---

[1]*See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon 2007).

[2]*See Id.* §§ 12.31 (Vernon 2003), 19.03 (Vernon Supp. 2007).

challenges the legal and factual sufficiency of the evidence to support his conviction, and he complains the trial court erred by denying his requested instruction on the lesser-included offense of aggravated robbery. We affirm.

## A. Background

Rodreka Thompson lived with her girlfriend, Clauthia Castrillon, known as "Coco," at the Britmoore Apartments in Houston. Appellant, known as "Chris," lived with them. Coco and appellant made money by selling marihuana. The apartment had a "smoke room," where they would measure and cut up the marihuana for sale. Thompson testified there were times when "Coco would leave amounts of cash laying around" the apartment and appellant was "sometimes" "aware of where that cash was kept." Coco did not trust appellant and "always hid her money." Coco put her money in a "safe box," which she kept under the bed. Coco and appellant sold marihuana for about a year. In late 2004, Coco told appellant to leave the apartment. After appellant moved out, he continued to come by the apartment and talk to Coco.

On the morning of February 7, 2005, Coco took Thompson to work and returned to their apartment. Between noon and 1:00 p.m. that day, LaQuietta Ayers, who also lived at the Britmoore Apartments, was in her apartment when she heard Crystal Mason banging on her front door. Mason, known as "Bird," was hysterical, bloody, and had duct tape around her arms and neck. She repeatedly told Ayers, "Chris did it." Mason knew appellant as "Chris."

When Officers Audie Cohn and Arturo Bazan arrived at Ayers's apartment, Mason told Officer Cohn, "Chris did it. Go check on my friend, Coco, because she's in the apartment." Officer Cohn found Coco's body in the living room of her apartment.

2

In the afternoon of February 7th, appellant called Rodreka Thompson, and afterwards he called Coco's sister, Noubia Castrillon. Thompson testified appellant told her that "three guys" came into the apartment where she and Coco lived

> and took him and Crystal [Mason] into the other room and took Coco into one room and started duct taping them, like trying to hog tie them. And he said that when he was in the other room, he tried to get away. When the guy was trying to tie him up, he tried to get away. So he so-called knocked him unconscious and jumped out the window is what he told me.

When the prosecutor asked her, "Did he tell you that there were three guys with guns that had come into the apartment?", she replied, "Yes." Thompson also testified appellant told her, "'I got that bitch Bird, Dreka.'"[3] That night, he called Thompson and asked her, "'Where's Coco at?'" When she told him Coco was dead, he did not say anything.

On cross-examination, Thompson stated she never saw appellant either threaten or act violent towards Coco. She testified Coco's safe box was under the bed when the murder occurred. The safe box was not taken during the incident, but that there is "nothing in it."

When appellant called Castrillon, he told her, "'It's Coco. It's Coco'" and said that he had been at Coco's apartment. He also said Bird (Crystal Mason)

> set them up. And he left and he came back from the store and when he came back from the store, he saw three men and a gun in his face. He said that his life flashed before his eyes. He told me that he stabbed Bird. He told me he beat a guy up and knocked him unconscious and that he jumped out the window.
>
> * * *
>
> Exactly he said that when he came over, he saw that Bird was there and then when the guys came in, it's like she set them up I guess dealing with drugs or whatever it had to do with it. That she set them up and that somebody was there to rob them.

---

[3]"Dreka" is Rodreka Thompson's nickname.

3

Noubia said appellant told her the three men were dressed in black and that the incident happened at Coco's apartment. When Noubia told appellant Coco was dead, he did not say anything.

On cross-examination, counsel asked Noubia, "Tell the jury how Chris [appellant] described why he thought Bird, Crystal Mason, had set them up." She replied, "He just basically told me that Bird set him and my sister [Coco] up. That's all he said." When Noubia asked appellant what had happened to Coco, he told her he did not know.

Shirley Cormier testified that on the date in question, she lived at the apartment complex. She testified that "a little after 1:00," as she went through the gate to enter the apartment complex, she saw "three guys" "going out the gate." She stated that "[i]t looked like they was running, but I didn't pay too much attention. . . ." When the prosecutor asked her if they were wearing "all black," she replied, "I really don't recall." She said one of them was wearing blue jeans, and another had a jogging suit.

Mason testified appellant and Coco sold marihuana together and stored their marihuana in the smoke room. On the morning of February 7, 2005, Mason received a call from Coco, stating she had taken Thompson to work and asking Mason to come to their apartment. Mason arrived at Coco's apartment sometime before 11:00 a.m. When appellant showed up at the apartment, Coco asked him to go buy condoms and cigars. Coco gave him money from a stack of money located on a dresser inside the bedroom. When appellant returned, he sat on the couch while Coco and Mason went in the bedroom. Later, appellant knocked on the bedroom door. Mason said that rather than getting out of bed to unlock the door, she told him to unlock the door with a butter knife. He came into the bedroom and left without saying anything, re-locking the door. Afterwards, he re-

4

entered the room, apologized, and then left the bedroom, locking the door behind him. He re-entered the bedroom again, this time with another man who pointed a revolver at Coco and Mason. Mason said that appellant, wearing gloves and wielding a knife and tape, asked, "[W]here the shit was." Appellant pulled Mason out of the bedroom while the other man kept his gun pointed at Coco. Appellant took Mason into the smoke room, taped her hands together, and told her to get on her knees. He taped her hands to her feet, grabbed her ponytail and began cutting her neck. When she fell forward, the tape binding her feet broke. Appellant stabbed her in the side and left the room. She escaped by jumping out the window.

Mason testified she later told the paramedic she did not know who had hurt her because she was scared "that they weren't going to find him and he was going to come and kill me." She stated she did not "set up" appellant with unknown men, and called it "stupid" and untrue for someone to claim that she set him up or that she "know [sic] where the thousands are at." Mason admitted she had been convicted of theft in 2002 and that there was presently an open warrant for her arrest for writing a hot check. She said that she had not been promised any special treatment by the D.A.'s office for her testimony.

*Appellant's Statement to Detective Alan Brown*

Thompson and Castrillon spoke to Detectives Alan Brown and John Swaim about what had happened. Afterwards, the detectives showed Mason a photo spread. She identified appellant as her attacker. In the late evening of February 7th, they arrested appellant for Coco's murder. After waiving his *Miranda*[4] rights, he voluntarily agreed to give Detective Brown an oral statement. When the prosecutor asked Officer Brown, "[W]hat did the Defendant tell you that was different than what Rodreka [Thompson] said?", he replied:

---

[4]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

That when he went to leave the apartment, the two masked men entered the apartment, both armed with guns, one had a shotgun, one had a pistol. Then later in the statement he talks about how Crystal Mason and himself are separated from Clauthia [Coco], who is deceased, and taken into the--I think it's the west bedroom or the bedroom to the right where the window screen is knocked out.

At that part when he's talking about that part, he says the two suspects took him in there. And I asked, "Who's with Coco," who is the nickname of the deceased female, and he says, "Well, no, no, no, just one guy. He gets his story back straight and he says, "No, just one guy is with me and he's got a knife."

And I asked, "Where did the pistol go," and he doesn't know where the pistol went. Then he talks about the supposed other suspects--suspect puts the knife on top of the T.V. and when he does that, that he, the defendant, starts hitting him and beating him up. And they start, what is his words, tussling all over the room. Well, the room--the room where this occurred, there's pictures lined up on a windowsill across the room, there's a futon bed, there's a table and there's a T.V. on a stand. There was definitely no fight between two men in this room because nothing is disturbed in the room except for where Crystal Mason went out the window where the blood is in front of the window and the blinds and the screen is kicked out.

When he's talking about it, he says he has the knife in his hand--he says the guy puts the knife on top of the T.V. and that's when he hits him and they start tussling and he says, "I hit him one last time." And he's real dramatic, you know, he makes noises, like, (indicating) I hit him, and he says I stunned him really hard and he dropped the knife.

And I said, "Well, I thought you said he put the knife on top of the T.V.," and he said, "Well, he must have grabbed it back. Somewhere in this tussle he must have grabbed it back."

So he says that once he stabs Crystal Mason in the side, he goes out the window, leaving her there. So I clarify with him that he never went back into the apartment, he never went back into the front rooms, that after he stabbed her and went out the window, he never returned back into any of those rooms. And he said no, that's because he had a cut on his hand.

And I knew we had taken blood samples from various parts of that room, in the kitchen, where Ms. Castrillon's [Coco's] body was, the room where this--where Ms. Mason was stabbed. So we took all these various blood samples from these places. So his blood and his DNA should not show up back in that room. And it did.

Asked whether appellant mentioned that he had stabbed Mason because he thought she had "set him up or something like that," he replied, "Yes," "he said he stabbed her and left the knife" "in that room." The prosecutor questioned Officer Brown as follows:

Q. Now, looking at State's Exhibit 69, do you see on that exhibit, . . . the east wall of the living room?

A. Yes, sir.

Q. How close is that to the Complainant's [Coco's] body?

A. [T]hree feet.

Q. And you also see a cabinet there in the kitchen there in one whatever?

A. Yes, sir.

* * *

Q. [D]id you verify that the Defendant's blood, the Defendant's DNA was located on that east wall [of the living room] and in the kitchen?

A. Yes.

Q. Now, is that inconsistent--is that inconsistent, Officer Brown, with his claim that this tussle went on in the smoke room and that he had cut his hand fighting with this knife?

A. Yes.

Q. Did he ever tell you that he had been involved in any kind of a fight or confrontation in either of the front room, the kitchen or the dining room?

A. No, sir, just that one bedroom.

Appellant told Officer Brown the assailants were dressed in "all black."

*The Forensic Evidence*

Officer Glenn Riddle collected blood samples and retrieved evidence from the crime scene. He found blood on the steps leading up to Coco's apartment and on the outside doorknob of her apartment's front door. Inside her apartment, he found blood on the

7

kitchen counter, kitchen cabinet, and on the kitchen-stove knobs. He said three or four rags had been placed on the stove top "that would appear to be an attempt to start a fire." He found a steak knife[5] on the dining-room floor. The blade's tip was bent, and the blade had blood on it. He testified, "It appeared that the knife had been used with some force on something or somebody." He found a small sawed-off shotgun in between the mattress and box springs of the bed in the east bedroom (Coco's bedroom). He found a large pool of blood on the carpet next to a window in the smoke room (the west bedroom). He found a "pattern of cast-off blood spatter"[6] towards the bottom of an open closet door. He said this spatter "could be consistent with someone . . . jumping out that window" "[a]nd having laid on the floor there for enough of a period of time for that blood pool to collect in the carpet." Appellant's fingerprints were not found at the scene. However, Officer Riddle said this did not mean appellant was not there.

Jennifer Otto, a forensic DNA analyst,[7] tested the blood samples collected at the crime scene. She obtained "a full female DNA profile" from blood found on a step outside of Coco's apartment. This DNA profile matched the profile obtained from Coco. A "full male profile" was obtained from blood obtained from a kitchen-cabinet door. This DNA profile matched appellant's DNA profile. A blood sample taken from the east wall of the living room matched appellant's DNA profile. Otto found appellant's blood on cuttings from appellant's boxer shorts and pants. A blood sample taken from the windowsill of the west bedroom matched Mason's DNA profile. Blood taken from the steak knife's blade matched

---

[5]This knife was admitted into evidence as State's Exhibit 203.

[6]When the prosecutor asked Officer Riddle to explain what he meant by "blood spatter," he stated, "Blood that is projected or cast off of something, rather than transferred." When the prosecutor asked him, "Would that be consistent with somebody who is moving quickly or in some form of motion trying to go from one point to another?", he replied, "It could be, yes."

[7]Jennifer Otto worked for Identigene, a Houston-based forensic and paternity DNA testing company.

Mason's profile. With respect to blood taken from a roll of duct tape found at the scene, Otto said the blood had "a mixture of DNA. The reference from Mason is consistent with the major component" and that "[h]er profile was found on the roll of duct tape."

On cross-examination, Otto testified that based upon how the blood samples were packaged and stored before she received them, she could not say there was no cross contamination of the samples. In her opinion, Coco's blood was on a kitchen-stove knob, the kitchen counter, and on the outside doorknob of the front door to the apartment. Otto did not find Coco's or Mason's blood on appellant's arms.

*The Autopsy Results*

Dr. Anna Lopez, a forensic pathologist at the Harris County Medical Examiner's Office, supervised Coco's autopsy. She testified Coco had a total of eight cuts on her face and neck, indicating an attempt to cut open her throat. She also had a cut on her right wrist, which Dr. Lopez described as a defensive wound. Coco had two gunshot entrance wounds, one on her right cheek and the other on her forehead. Both wounds were surrounded by soot and strippling, indicating a close range of fire. The bullet that had entered the cheek had lodged inside the left parietal lobe of the brain, and the bullet that had entered the forehead was lodged under the scalp in the back of the head. When the prosecutor asked Dr. Lopez whether the bullets could have come from a shotgun, she replied, "[T]hese are bullets. And it's completely different from a shotgun injury." Typically in a shotgun wound, she would find several smaller pellets as well as the shotgun wadding. Dr. Lopez explained that a shotgun wound would have produced more "distortion" to the facial tissues and bone.

Dr. Lopez said the cause and manner of death was a homicide caused by gunshot wounds to the head and sharp-force injuries to the head and neck. She explained that

9

while the gunshot wounds were the "main" cause of death, the cuts to Coco's face and neck "caused significant bleeding," and thus Dr. Lopez had listed the cuts as a cause of death. Asked whether the cuts alone could have killed Coco, Dr. Lopez said that, while none of the major blood vessels had been cut, left untreated for long enough, the cuts could have led to death. When the prosecutor asked her whether Coco's wounds could have been caused by two different people, she replied, "[I]t's possible" because there were two gunshot wounds and there were wounds from two different weapons. The prosecutor then asked whether Coco, after being shot in the face, could have been able to place her own blood on the stove or the stairs, Dr. Lopez said no.

On cross-examination, Dr. Lopez testified she could not tell whether the gunshot wounds or stab wounds had come first, and said that it would be impossible to determine that based on an autopsy.

Appellant did not testify at trial and no defense testimony was offered.

B. Discussion

*1. Legal and Factual Sufficiency of the Evidence*

In issues one and two, appellant challenges the legal and factual sufficiency of the evidence to support his conviction for capital murder. In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hampton v. State*, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. The trier of fact is the sole judge of the weight

10

and credibility of the evidence. TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

When reviewing the factual sufficiency of the evidence, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We will set aside the verdict only if: (1) the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust; or (2) the verdict is against the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 414-15; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). We cannot conclude a conviction is "clearly wrong" or "manifestly unjust" simply because we would have voted to acquit. *Watson*, 204 S.W.3d at 417. In other words, we may not simply substitute our judgment for the fact-finder's judgment. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). To reverse for factual sufficiency, we must determine, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 417. In examining a factual sufficiency challenge, we defer to the fact-finder's determination of the credibility of the evidence. *Swearingen v. State*, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003).

*The Law of Capital Murder*

As charged in this case, a person commits capital murder if he or she commits murder as defined under section 19.02(b)(1) of the Texas Penal Code and, *inter alia*, the person intentionally commits the murder in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 2007). A person commits murder if he or she "intentionally or knowingly causes the death of an individual." *Id*. § 19.02(b)(1) (Vernon 2003). A person commits robbery if, in the course of committing theft, as defined in Chapter 31 of the Texas Penal Code, and with intent to obtain or maintain control of property, he or she intentionally, knowingly, or recklessly causes bodily injury to another, or intentionally or knowingly places another in fear of imminent bodily injury or death. *Id*. § 29.02(a). Theft is the unlawful appropriation of property with the intent to deprive the owner of the property. TEX. PENAL CODE ANN. § 31.03 (Vernon Supp. 2007). A person acts intentionally with respect to a result of his or her conduct when it is his or her conscious objective or desire to engage in the conduct or to cause the result. TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003).

Circumstantial evidence, by itself, may be enough to support a jury's verdict. *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999); *see Smith v. State*, 965 S.W.2d 509, 515 (Tex. Crim. App. 1998). It is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

*The Law of Parties*

The charge included an instruction on the law of parties. "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (Vernon 2003). A person is criminally responsible for an offense committed by the conduct of another if: (2) "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). "Each party to an offense may be charged with commission of the offense." *Id.* § 7.01(b).

While the presence of an accused at the scene of an offense is not alone sufficient to support a conviction, it is a circumstance tending to prove guilt, which, combined with other facts, may suffice to show that the accused was a participant. *Beardsley v. State*, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987). Further, participation in an enterprise may be inferred from circumstances and need not be shown by direct evidence. *Id.* at 684.

In this case, a rational jury could have determined the following from the evidence: (1) appellant lived in the same apartment as Coco and Thompson and moved out in late 2004; (2) Coco and appellant made money selling marihuana together; (3) Coco left money laying around the apartment and, on the day of the murder, she gave him money to buy condoms and cigars from a stack of money on the dresser; (4) Coco kept her money in a safe box under her bed; (5) Coco stored marihuana in the smoke room; (6) while Coco and Mason were in Coco's bedroom, (7) appellant entered the bedroom with another man who pointed a revolver at them; appellant asked, "Where the shit was;" (8) the safe box was under the bed when Coco was murdered; (9) the safe box was not taken during the incident, but after the murder, there was nothing in the safe box; (10) Coco died from two

13

gunshot wounds to the face; (11) appellant said that he had stabbed Crystal Mason; (12) Mason denied that she had set up appellant; and (13) after the incident, appellant left the scene.

Controverting evidence showed that: (1) appellant claimed Mason had set up Coco and himself for a robbery perpetrated by either two or three male subjects; (2) appellant's blood was found in Coco's apartment, on his pants, and on his boxers, indicating he was injured during the incident; (3) no one saw who killed Coco; (4) no one saw appellant or the man with the revolver take anything from Coco's apartment; (5) appellant's fingerprints were not found in the apartment; (6) appellant had never previously threatened Coco nor acted violently towards her; and (7) three men were seen leaving the apartment complex contemporaneous to the time of the incident.

The jury was entitled to disbelieve appellant's statements that Mason had set up Coco and appellant to be robbed by two or three men. *See Margraves,* 34 S.W.3d at 919; *see also Roy v. State,* 997 S.W.2d 863, 868 (Tex. App.–Fort Worth 1999, pet. ref'd). Viewing the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient for a rational jury to find appellant guilty of capital murder, either as a party or acting alone, beyond a reasonable doubt. We also conclude that the evidence supporting the conviction is not so weak that the fact-finder's determination is clearly wrong and manifestly unjust, or that the verdict is against the great weight and preponderance of the evidence. Issues one and two are overruled.

*2. Lesser-Included Offense Instruction*

In his third issue, appellant contends the trial court erred in failing to instruct the jury on the lesser-included offense of aggravated robbery. Whether one offense is a lesser-included offense of another is determined by application of article 37.09 of the Texas Code

14

of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 37.09. The court of criminal appeals recently clarified the two-step analysis to be used in applying article 37.09. *Hall v. State,* 225 S.W.3d 524, 534-37 (Tex. Crim. App. 2007). In the first step, the elements of the offense as alleged in the indictment are compared to the statutory elements of the potential lesser-included offense. *Id.* at 535-36. If the elements of the lesser offense could be established by proof of the same or less than all of the facts required to establish the commission of the charged offense, then the analysis moves to the second step. *Id.* at 536-37. Here, the parties agree that under the circumstances of this case, aggravated robbery was a lesser-included offense of capital murder. We therefore move to consideration of the second analytical step.

In the second step, the evidence adduced at trial must be reviewed to determine if there is some evidence to support instructing the jury on the lesser-included offense. *Id.* In order to support submission of the lesser-included offense, the evidence must include proof of the lesser offense, and the evidence must show that if the defendant is guilty, he or she is guilty only of the lesser-included offense. *Id.* (citing *Bignall v. State,* 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)). Submission of a lesser-included offense is not required simply because the jury may disbelieve crucial evidence pertaining to the greater offense; rather, there must be some evidence directly germane to the lesser-included offense before an instruction on a lesser-included offense is warranted. *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003).

Rather than pointing to evidence affirmatively demonstrating that he committed only aggravated robbery, appellant argues there is no evidence to show he killed Coco and that a rational jury could have had a reasonable doubt about whether he could have anticipated that the man with the revolver would kill Coco. However, while this point may have caused

the jury to closely consider what appellant did know before Coco's murder (e.g., that they were going to commit a robbery and that the other man was armed with a pistol), it does not constitute evidence directly germane to the lesser-included offense, which suggests if appellant is guilty, he is guilty only of the lesser-included offense. Contrary to appellant's assertion that this evidence shows he did not have reason to anticipate that murder may occur in the course of the aggravated robbery, it demonstrates instead that appellant in fact knew that they were going to commit robbery armed with a deadly weapon. *See, e.g., Love v. State,* 199 S.W.3d 447, 454-55 (Tex. App.–Houston [1st Dist.] 2006, pet. ref'd) (holding that defendant's participation in robbery with knowledge that co-conspirator might use a gun in committing the robbery was sufficient to sustain conviction for capital murder under the law of parties). Accordingly, we overrule appellant's third issue.

We affirm the trial court's judgment.


ROSE VELA
Justice


Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 12th day of June, 2008.

16