Opinion issued February 13, 2009 



 
 
 
 
 
 
 
 
In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-06-01121-CV
__________
 
ROSE BARTON, INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF CHRISTOPHER MARTIN
DEAN, Appellant
 
V.
 
WHATABURGER, INC., Appellee
 

 
 
On Appeal from the 157th District Court
Harris County, Texas
Trial Court Cause No. 2003-30240
 

 
 
OPINION DISSENTING FROM THE 
DENIAL OF EN BANC CONSIDERATION

          The panel, in its opinion, erroneously holds that the trial court did not err in
granting summary judgment against appellant, Rose Barton, Individually and as
Personal Representative of the Estate of Christopher Martin Dean, “because the
diabolic conduct of others—men who committed aggravated robbery and murder—
was a superseding cause of Dean’s death that was not reasonably foreseeable” to
appellee, Whataburger, Inc., as a matter of law.
          In this case, a Whataburger overnight-shift manager, Gregory Love, who had
planned with others to rob the Whataburger restaurant he managed, was directly
responsible under the law of parties


 for the capital murder of Dean. Love had, prior
to his employment by Whataburger, been convicted of and incarcerated for
committing two felony offenses of delivery of crack cocaine


 in Indiana. 
          In concluding that the general character of the actions of Love, which resulted
in the capital murder of Dean, could not have been reasonably anticipated by
Whataburger, the panel characterizes the real and inherent relationship between
narcotics dealing and firearms and violence as “stereotypical” and conflates the duties
owed by premises owners to their invitees with an employer’s duties to exercise
ordinary care in its hiring of employees and to provide its employees with a
reasonably safe work environment. Accordingly, I respectfully dissent from the
denial of en banc consideration of this case. See Tex. R. App. P. 41.2(c) . 
Factual and Procedural Background
          Dean, a mentally disabled but “very dedicated” Whataburger employee of
fourteen years, was murdered when he was shot in the face by Gerald Marshall, who
was, at the direction of Love, attempting to rob the Whataburger restaurant at which
Love served as manager. See Love v. State, 199 S.W.3d 447, 449–51 (Tex.
App.—Houston [1st Dist.] 2006, pet. ref’d); Worthy v. State, No. 01-06-00134-CR,
2007 WL 624667, at *1–3, 6 (Tex. App.—Houston [1st Dist.] March 1, 2007, pet.
ref’d) (mem. op., not designated for publication). 
          The underlying facts of this case, which are not in dispute, have already been
summarized by this Court. See Love, 199 S.W.3d at 449–51; Worthy, 2007 WL
624667, at *1–3. One night prior to the robbery, Love met and spoke with Marshall
in the Whataburger parking lot. See Love, 199 S.W.3d at 449. Love suggested that
Marshall should return to the restaurant to commit a robbery on a night between
3:00 a.m and 4:00 a.m., when Love was on duty. Id. Love “told Marshall to enter
the store by climbing through the drive-through window.” Id. This information was
critical to the success of the robbery because Whataburger, like most fast-food
restaurants, closed its dining room during its graveyard shift and only served
customers through its drive-through window. See id.; Worthy, 2007 WL 624667, at
*1. 
          Subsequently, on May 11, 2003, Love reported to work early, apparently in an
attempt to entice the manager on the previous shift to leave early. Love, 199 S.W.3d
at 450. Love’s plan worked, as the manager left work early and entrusted Love with
the money from the previous shift to count and place in the restaurant safe. Id.
Shortly after the previous manager left, Love, who had been in contact with Marshall
by cellular telephone, made up a story so that he could leave the restaurant. Id. Love
then left Dean in charge of the restaurant and directly in the path of Marshall. Id.
          Dean, although mentally disabled, was a hard-working man whose life’s
ambition was to one day own or manage a Whataburger restaurant. Worthy, 2007 WL
624667, at *6 (summarizing Barton’s testimony that Dean loved “all of his jobs, but
he loved Whataburger the most,” his “biggest dream” was to own or manage a
Whataburger restaurant, he “wore his Whatabuger shirt everywhere, even to church,”
and he “was buried in his Whataburger shirt”). Dean, after noticing that Love had not
counted the money in the registers from the previous shift, took it upon himself to
count the money and deposit the excess amount, approximately $1,600, in the
lockbox. Love, 199 S.W.3d at 451. Although Dean’s dedication saved Whataburger
its money, it cost Dean his life.
          At approximately 4:00 a.m., Marshall and two other men arrived as planned at
the drive-through and placed an order. Id. When the men drove up to the window,
Marshall grabbed Dean through the window and, as per Love’s instructions, climbed
through the drive-through window to enter the restaurant. Id. As the other
Whataburger employees hid, Marshall chased Dean to the back of the restaurant and,
with a firearm in hand, demanded that Dean give him a key to the safe. Id. Dean did
not have a key to the safe because it could only be opened by combination. Id. After
Marshall demanded a key from Dean three times and Dean did not produce the key,
Marshall shot Dean in the face, ending Dean’s life. Id. 
          Barton brought this wrongful death and survival lawsuit, alleging that the
negligence of Whataburger proximately caused Dean’s death. See Tex. Civ. Prac.
& Rem. Code Ann. §§ 71.002(a)–(b), 71.004(a) (Vernon 2008). Specifically, Barton
alleged that Whataburger failed to maintain a safe workplace, was negligent in hiring
Love, a convicted narcotics trafficker, and was negligent in its supervision and
training of its employees. 
          Whataburger moved for summary judgment, asserting that, as a matter of law, 
it was “under no duty to screen the criminal background” of Love and “the criminal
incident made the basis of Barton’s lawsuit was not foreseeable to Whataburger.” See 
Tex. R. Civ. P. 166a(c). Whataburger also asserted that there is no evidence that “the
criminal incident made the basis of Barton’s lawsuit was foreseeable to
Whataburger,” “Whataburger breached a duty of care with respect to the hiring,
training, and or supervision of its employees,” or any “breach of duty by Whatabuger
was the cause in fact” of Barton’s injuries. See Tex. R. Civ. P. 166a(I). Without
stating its basis, the trial court granted summary judgment against Barton.
          As it does on appeal, Whataburger, in its summary judgment motion below,
focused its arguments primarily on the issue of foreseeability, relying extensively on
the duties that premises owners owe to their invitees and, specifically, upon the
premises liability case of Timberwalk Apartments, Partners, Inc. v. Cain, 972 S.W.2d
749 (Tex. 1998). 
Standard of ReviewTo prevail on a “matter-of-law” summary judgment motion, a movant has the
burden of proving that it is entitled to judgment as a matter of law and that there is no
genuine issue of material fact. Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d
339, 341 (Tex. 1995). When a defendant moves for summary judgment, it must either
(1) disprove at least one essential element of the plaintiff’s cause of action or
(2) plead and conclusively establish each essential element of its affirmative defense,
thereby defeating the plaintiff’s cause of action. Cathey, 900 S.W.2d at 341; Yazdchi
v. Bank One, Tex., N.A., 177 S.W.3d 399, 404 (Tex. App.—Houston [1st Dist.] 2005,
pet. denied). In reviewing the summary judgment, we take as true all evidence
favorable to the nonmovant, and we indulge every reasonable inference and resolve
any doubts in the nonmovant’s favor. Valence Operating Co. v. Dorsett, 164 S.W.3d
656, 661 (Tex. 2005). 
          To prevail on a “no-evidence” summary judgment motion, a movant must
allege that there is no evidence of an essential element of the adverse party’s cause
of action or affirmative defense. Tex. R. Civ. P. 166a(i); Fort Worth Osteopathic
Hosp., Inc. v. Reese, 148 S.W.3d 94, 99 (Tex. 2004). We review a no-evidence
summary judgment under the same legal sufficiency standard used to review a
directed verdict. Gen. Mills Rests., Inc. v. Tex. Wings, Inc., 12 S.W.3d 827, 832–33
(Tex. App.—Dallas 2000, no pet.). Although the nonmoving party is not required to
marshal its proof, it must present evidence that raises a genuine issue of material fact
on each of the challenged elements. Tex. R. Civ. P. 166a(i); see Ford Motor Co. v.
Ridgway, 135 S.W.3d 598, 600 (Tex. 2004). A no-evidence summary judgment
motion may not be properly granted if the nonmovant brings forth more than a
scintilla of evidence to raise a genuine issue of material fact on the challenged
elements. See Ridgway, 135 S.W.3d at 600. More than a scintilla of evidence exists
when the evidence “rises to a level that would enable reasonable and fair-minded
people to differ in their conclusions.” Merrell Dow Pharms., Inc. v. Havner, 953
S.W.2d 706, 711 (Tex. 1997) (quoting Burroughs Wellcome Co. v. Crye, 907 S.W.2d
497, 499 (Tex. 1995)). When reviewing a no-evidence summary judgment motion,
we assume that all evidence favorable to the nonmovant is true and indulge every
reasonable inference and resolve all doubts in favor of the nonmovant. Spradlin v.
State, 100 S.W.3d 372, 377 (Tex. App.—Houston [1st Dist.] 2002, no pet.). In sum,
“[j]udgment without . . . a jury verdict is proper at any course of the proceedings only
when the law does not allow reasonable jurors to decide otherwise.” City of Keller
v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005) (emphasis added) (further noting that
“test for legal sufficiency should be the same for summary judgments, directed
verdicts, judgments notwithstanding the verdict, and appellate no-evidence review”). 
Foreseeability
          The common law claim of negligence consists of three essential elements—a
legal duty owed by one person to another, a breach of that duty, and damages
proximately resulting from the breach. El Chico Corp. v. Poole, 732 S.W.2d 306,
311 (Tex. 1987). Duty is the threshold inquiry because a plaintiff must prove the
existence and violation of a duty owed to her by a defendant to establish liability in
tort. Id. In describing “duty,” the Texas Supreme Court has explained:
. . . if a party negligently creates a situation, then it becomes his duty to
do something about it to prevent injury to others if it reasonably appears
or should appear to him that others in the exercise of their lawful rights
may be injured thereby.
 
Id. (quoting Buchanan v. Rose, 159 S.W.2d 109,110 (Tex. 1942)). Generally, the
existence of duty is a question of law for a court to decide from the facts surrounding
the occurrence in question. Greater Houston Transp. Co. v. Phillips, 801 S.W.2d
523, 525 (Tex. 1991). However, when the evidence or the reasonable inferences to
be drawn therefrom about foreseeability as it relates to duty are disputed, the question
becomes one for the jury, and the trial court should instruct a jury about this element
so that it can resolve the factual issues. Union Pacific R.R.Co. v. Williams, 85 S.W.3d
162, 169 (Tex. 2002); Mitchell v. Missouri- Kansas-Texas R.R. Co., 786 S.W.2d 659,
662 (Tex. 1990). “[W]here the risk reasonably to be perceived defines the duty to be
obeyed; i.e., where knowledge and foreseeability are important elements of duty,” the
issue is “properly and best resolved by the finder of fact.” Mitchell, 786 S.W.2d at
662.
          In determining whether a defendant was under a particular duty, courts
“consider several interrelated factors, including the risk, foreseeability, and likelihood
of an injury weighed against the social utility of an actor’s conduct, the magnitude of
the burden of guarding against injury, and the consequences of placing the burden on
the defendant.” Phillips, 801 S.W.2d at 525. Of all of these factors, foreseeability
of the risk is “the foremost and dominant consideration.” Id. Specifically, before
liability will be imposed for an act of negligence, the evidence must justify a finding
that the party committing the negligent act “ought to have foreseen the consequences
thereof in the light of the attendant circumstances.” Carey v. Pure Distrib. Corp., 124
S.W.2d 847, 849 (Tex. 1939). 
          However, it is not required that the particular accident or event complained of
should have been foreseen. Id. Rather, as explained by the Texas Supreme Court,
All that is required is that the “injury be of such general character as
might reasonably have been anticipated; and that the injured party
should be so situated with relation to the wrongful act that injury to him
or to one similarly situated might reasonably have been foreseen.”
 
Id. (quoting San Antonio A. P. Ry. Co. v. Behne, 231 S.W. 354, 356 (Tex. Comm’n
App. 1921)). 
          Generally, there is no duty to control the conduct of a third person. Phillips,
801 S.W.2d at 525 (citing Restatement (Second) of Torts § 315 (1965)).
However, this general rule does not apply when a special relationship exists between
the actor and the third person which imposes a duty upon the actor to control the third
person’s conduct. Id. (citing Restatement (Second) of Torts § 315(a) (1965)).
Such special relationships include the relationship between employer and employee. 
Id. (citing Restatement (Second) of Torts § 317 (1965)). Thus, even when an
employee, such as Love, acts outside the scope of his employment, an employer has
a duty to exercise reasonable care to control its employee to prevent him from
intentionally harming others, or from so conducting himself as to create an
unreasonable risk of bodily harm to them, if the employee is upon the employer’s
premises, or uses the employer’s property, and the employer knows, or has reason to
know, that he has the ability to control the employee and knows, or should know of,
the necessity and opportunity for exercising such control. Restatement (Second)
of Torts § 317.      
          It is true that an employer, like Whataburger, is not an insurer of its employees’
safety. Kroger Co. v. Elwood, 197 S.W.3d 793, 794 (Tex. 2006); Leitch v. Hornsby,
935 S.W.2d 114, 117 (Tex. 1996); Exxon Corp. v. Tidwell, 867 S.W.2d 19, 21 (Tex.
1993). However, Texas law recognizes that an employer does have a duty to
(1) provide rules for the safety of employees and warn them of reasonably foreseeable
hazards; (2) furnish reasonably safe machinery and equipment; (3) furnish a
reasonably safe place to work; and (4) exercise ordinary care to select careful and
competent fellow employees. Fort Worth Elevators Co., 123 Tex. 128, 135–36, 70
S.W.2d 397, 401 (1934); see also Kroger Co., 197 S.W.3d at 794; Humble Sand &
Gravel, Inc. v. Gomez, 146 S.W.3d 170, 186 n.45 (Tex. 2004). 
          Thus, the fundamental questions about foreseeability before this Court are (1)
whether the injury to Christopher Dean was “of such general character as might
reasonably have been anticipated” by Whataburger after it had hired and placed Love,
a man previously convicted on two counts of felony delivery of narcotics, into one
of its restaurants as a night-shift manager, and (2) whether Dean was “so situated with
relation to the wrongful act[s]” of Love that injury to him or his fellow employees
“might reasonably have been foreseen.” 
          Here, in support of its matter-of-law summary judgment motion under rule
166a(c), Whataburger attached evidence showing that it had hired Love on
November, 19, 2002, and, on December 31, 2002, promoted him from “team-leader”
to manager. Also, when filling out his job application, Love represented that he had
no prior felony convictions, and Whataburger paid for a criminal background check, 
which revealed that Love, from November of 1995 to November of 2002, had no
criminal record in Harris County, Texas. Furthermore, while employed by
Whataburger for almost six months, Love had not received any reprimands for any
“criminal or dangerous” conduct. Whatabuger also attached evidence that showed,
five years prior to the robbery, the restaurant experienced only five “criminal
incidents” that had been reported to Whataburger employees and, in the three years
prior to the robbery, there had not been any aggravated assaults, sexual assaults or
murders committed at the restaurant. 
          Barton attached to her response to Whataburger’s summary judgment motion
the affidavit testimony of Chris McGoey. McGoey, the president of his own security
consulting firm for over 21 years, testified that he has written a book, several book
chapters, and over 90 articles on the subjects of crime foreseeability, premises
liability, workplace violence, and fast-food restaurant security. After reviewing the
police offense report, the court records, Houston Police Department records,
Whataburger records, numerous witness statements and depositions, and the crime
scene photographs, McGoey wrote his report on the capital murder of Christopher
Dean. 
          In his affidavit, McGoey testified that 
[T]he greatest risk of serious workplace violence including homicide
(80%) comes from being a victim of an armed robbery. Workplace
homicide was the second leading cause of death to American workers,
Late night eating and drinking places are identified as one of the high-risk retail establishments that constitute the largest share of workplace
homicides.
 
It comes as no surprise that, generally, perpetrators do not randomly target the
businesses that they attack. Rather, they select their targets based on a risk analysis
of a business’ various weaknesses, including escape routes, number of employees and
customers, and lack of security guards, alarms, bullet-resistant barriers, and
surveillance equipment. Accordingly, as per McGoey, most convenience stores and
fast-food chains have implemented a number of important and effective security
measures to reduce the risk that their employees will be robbed.
          McGoey emphasized that Whataburger was the only fast-food chain of which
he was aware that had “failed to develop a comprehensive robbery prevention
program to protect its employees.” At the time of the capital murder of Dean,
Whataburger had no security manual or methodology in place. There were no
minimum standards published or training provided to managers, and “Whataburger’s
conduct of not addressing workplace violence and robbery prevention fell below the
standard of care and constituted malice or conscious indifference to the magnitude
of the risk of harm and disregard for the safety of its employees. This conduct was
a proximate cause of Christopher Dean’s death.”
          According to McGoey, Whataburger was “about twenty years behind the
industry standard.” Moreover, by delegating the responsibility of security to local
restaurant managers, who were required to reduce expenditures and then received a
bonus for doing so, Whataburger had created a strong disincentive for managers to
spend adequate money on drive-through window maintenance, security cameras,
alarms, and security guards. McGoey, in his testimony, also highlighted several
robberies in which a robber had entered a Whataburger restaurant through its
inadequate drive-through windows, and at least one of the robberies was thought to
be an “inside job.” McGoey opined, 
Greg Love merely took advantage of a restaurant that lacked basic fast-food restaurant security systems, lacked robbery prevention training, had
poor security procedures, and lacked adequate supervision by other
managers. Proper security measures implemented by Whataburger
would have taken most of the opportunity away from Greg Love and
thereby prevented the robbery. For example, a time-delay safe with
access controlled by the general manager; not carelessly leaving both
keys in the safe; swing shift manager dropping cash; a modern self-closing and lockable drive-thru window; off-duty police officer; and a
combination of surveillance camera and hold-up alarm system as
significant deterrents. Of course a proper pre-employment background
check would have kept Greg Love from having a position of
responsibility and opportunity. 
          McGoey noted that a series of armed robberies at the restaurant in question in
1997–1998 “should have been a wake-up call to implement adequate security
measures in keeping with the established industry standards.” Although the
restaurant did temporarily employ off-duty police officers after these robberies, it
terminated their services, and Whataburger should have foreseen the risk that violent
crime would return because “basic fast-food robbery prevention measures were not
implemented to fill the deterrence void.” 
          In regard to the negligent hiring of Love, McGoey testified that it is “the
industry standard of care to conduct criminal background checks on all restaurant
manager applicants in every county where they had lived.” (Emphasis added.) In
fact, he noted that Whataburger’s own security experts agreed that Whatabuger had
a duty to conduct criminal background checks, managers can be involved in dishonest
acts, including robberies, such checks should include more than one county of
residence, and no job offer should be made until the check is completed. McGoey
also noted that although Whatabuger’s Corporate Director had discussed with
Restaurants Today the importance of protecting employees from crime by conducting
thorough interviews and background checks, Whatabuger, for cost reasons, limited
its background check of Love to Harris County only. 
          Specifically, McGoey noted that Whatabuger had paid $11.00 to William
Saxon to perform the criminal background check on Love in Harris County only. 
Although Saxon had informed Whataburger in 1995 that he could “easily” check
criminal records in any county in the nation for a reasonable fee, and Saxon had the
ability of performing a “Positive ID” search of Love’s social security number,
Whataburger chose to request only a minimal search at a base price. McGoey
testified that, using the information available to Whataburger, he discovered Greg
Love’s felony convictions on the Internet in a matter of minutes for $35.00. He also
noted that the first three digits of Love’s social security number obviously indicated
that he was born in Indiana. McGoey agreed with one of Whatburger’s own security
consultant’s that a one-county criminal background search was inadequate. McGoey
concluded that 
In my opinion, hiring a felon convicted for narcotics sales was a very
careless decision especially for a manager job that involves safety of a
crew in a late-night fast-food restaurant. Whataburger’s conduct fell far
below the standard of care in background screening to the point were it
constituted malice or conscious indifference to the magnitude of risk and
safety of its employees and a proximate cause of Christopher Dean’s
death. 
 
          In its reply to Barton’s response to its summary judgment motion, Whataburger 
stressed its no-evidence assertions and contended that Barton had failed to answer the
question, “How was Whataburger supposed to have known that Greg Love would
plan an inside job?” Whataburger then repeated its contention that there is a lack of
foreseeability on Barton’s negligent hiring claim and, based on Timberwalk, a lack
of foreseeability on what it labels as Barton’s “Premises Security Claim.” 
          The readily apparent problem with both of these contentions is that (1) Barton
has not alleged a “Premises Security Claim” or any kind of premises liability claim
and (2) the pertinent foreseeability question presented for consideration in this case
is not the question that Whataburger has artfully framed. Nevertheless, in Barton’s
appeal, the panel erroneously holds that Barton: 
(1) “failed to produce more than a scintilla of evidence” that, even
assuming that appellee, Whataburger, Inc., should have
discovered Love’s criminal history, “it was reasonably
foreseeable that Love would conspire in the aggravated robbery
that resulted in Dean’s murder,” and
 
(2)“failed to raise a fact issue” on “the Timberwalk factors of
proximity, recency, frequency, similarity, and publicity” that “the
aggravated robbery resulting in Dean’s murder at the Whatburger
restaurant was foreseeable, so as to impose a duty upon
Whatabuger to take reasonable measures to prevent it.” 
 
Moreover, relying on its analysis in making these holdings, the panel further
erroneously holds that, in regard to Barton’s claims regarding Whataburger’s other
acts of negligence,“the trial court properly granted summery judgment because the
diabolic conduct of others—men who committed aggravated robbery and
murder—was a superseding cause of Dean’s death that was not reasonably forseeable
to Whataburger.” 
Negligent Hiring
          In regard to the first holding on Barton’s negligent hiring claim, as noted by the
panel in its opinion, the case law recognizing the inherent connection between
narcotics dealing and violence is legion. See, e.g., Carmouche v. State, 10 S.W.3d
323, 330 (Tex. Crim. App. 2000) (“Since weapons and violence are frequently
associated with drug transactions, the officers reasonably believed that the individual
with whom they were dealing was armed and dangerous.”); Chase v. State, No.
01-02-00536-CR, 2003 WL 1563761, at *2 (Tex. App.—Houston [1st Dist.] March
27, 2003, pet. ref’d) (mem. op., not designated for publication) (same). Yet, the panel
considers this connection as being merely “stereotypical, and is necessary to protect
police officers and deter crime.” 
          However, the harsh reality, as recognized by the law and the public, is that the
connection between narcotics dealing and violent crime is quite real—it is not merely
“stereotypical.” See id. On a daily basis, our newspapers and local television news
programs report of homicides related to narcotics deals “gone bad.” Moreover, it is
within our common knowledge that those involved in dealing in narcotics are
generally considered by law enforcement authorities to be particularly dangerous
individuals. In addition to this obvious, inherent connection between narcotics
dealing and weapons and violence, it is also fair to note that one who chooses to
engage in the unlawful selling of narcotics is doing so with the express purpose of
acquiring money by illegitimate means. It is reasonable to infer that a person who is
willing to sell narcotics to acquire money unlawfully, a crime that carries with it the
threat of serious criminal punishment and significant periods of confinement, and a
person who has in fact been convicted on two counts of dealing narcotics, would also
be willing to engage in other unlawful conduct, such as theft and robbery, to acquire
money unlawfully. It seems self evident that a fast-food restaurant, in order to
provide a safe working environment for its other employees, should consider these
simple facts before hiring a convicted narcotics dealer to serve as the night manager
of one of its restaurants. 
          Here, the record shows that Whataburger was aware of these connections at the
time it hired Love. As noted by Barton in her motion for en banc rehearing
(1) Whataburger’s area manager testified, “If I was aware that he had committed a
felony, sir, I would not have hired him”; (2) Whataburger’s security consultant, when
asked whether a person’s convictions for dealing narcotics would make him ineligible
for employment, testified, “I don’t know quite how to answer that — it’s so obvious,
I don’t know how to answer the question. He’s not the type of person you would
want running the store”; and (3) Whataburger’s screening agent testified that he
would not have hired someone who had been convicted of theft, violent crimes, or
dealing narcotics.
          To survive Whataburger’s summary judgment motion on her negligent hiring
claim, Barton was not required to show that Whataburger should “have known that
Greg Love would plan an inside job” or that Whataburger should have foreseen the
specific criminal event that lead to Dean’s death. Carey, 124 S.W.2d at 849. Rather,
as explained by the Texas Supreme Court, she was only required to demonstrate that
the injury of Christopher Dean was “of such general character as might reasonably
have been anticipated” and that Dean was “so situated with relation to the wrongful
act that injury to him or to one similarly situated might reasonably have been
foreseen.” Id. 
          Here, Barton, through McGoey, presented evidence that Love took advantage
of his position in a restaurant that “lacked basic fast-food restaurant security systems,
lacked robbery prevention training, had poor security procedures, and lacked
adequate supervision by other managers.” McGoey further testified that, in his
opinion, “hiring a felon convicted for narcotics sales was a very careless decision
especially for a manager job that involves safety of a crew in a late-night fast-food
restaurant.” Why? Because common sense dictates that hiring an individual with a
felony conviction on two counts of delivery of narcotics and placing him in a night-time management position at a fast-food restaurant in charge of other employees
would obviously endanger the restaurant and the safety of those employees.           In this case, a reasonable juror could conclude that given Love’s criminal
history, his actions were foreseeable. Accordingly, I would hold that Barton’s
evidence demonstrates that the injury to Dean was of such general character as might
reasonably have been anticipated by Whataburger and that Dean was so situated with
relation to the wrongful acts of Love that injury to him and other employees in the
restaurant was reasonably foreseeable. At the very least, Barton presented some
evidence of foreseeability, and, although the evidence and the inferences arising from
that evidence may be disputed by Whataburger, a fact-finder should be allowed to
resolve any such fact issues. See Union Pacific R.R. Co., 85 S.W.3d at 169; Mitchell,
786 S.W.2d at 662. 
Failure to Provide Safe Workplace and Ordinary Negligence
           In regard to the panel’s holding that Barton has “failed to raise a fact issue” on
“the Timberwalk factors of proximity, recency, frequency, similarity, and publicity”
and the panel’s more general holding that “the diabolic conduct of others . . . was a
superseding cause of Dean’s death that was not reasonably foreseeable to
Whataburger,”


 the panel conflates the duties owed by premises owners to their
invitees with an employer’s duties to exercise ordinary care in its hiring of employees
and to provide its employees with a reasonably safe work environment. As noted by
Barton in her Motion for En Banc Rehearing, the panel opinion “erases the traditional
distinction between employer cases and premises liability cases.” Barton further
notes that “this is not a premises liability case.” 
          The panel agrees with the Fourteenth Court of Appeals that the Timberwalk
analysis applies “in the context of an employer’s duty to exercise reasonable care in
providing a safe workplace for its employees when an employee asserts that the
employer breached its duty by failing to protect the employee from criminal acts.” 
See Allen v. Connolly, 158 S.W.3d 61, 65 (Tex. App.—Houston [14th Dist.] 2005, no
pet.). The Texas Supreme Court did, as noted by the panel, hold in Timberwalk that
“[w]hen the ‘general danger’ is the risk of injury from criminal activity, the evidence
must reveal ‘specific previous crimes on or near the premises’ in order to establish
foreseeability.” 972 S.W.2d at 756. Also, the Fourteenth Court in Allen did conclude
that “because Allen [an employee] assert[ed] that Connolly [had] breached her
negligence duty as employer by failing to exercise reasonable care to protect Allen
from third party criminal acts, the Timberwalk analysis applie[d] to determine
whether Connolly owed a negligence duty to Allen under the facts of [the] case.” 158
S.W.3d at 66. 
          The panel in the instant case and the Fourteenth Court in Allen both quote
Sears, Roebuck & Co. v. Robinson for the proposition that “the nature of the duty of
the landowner to use reasonable care to make his premises reasonably safe for the use
of his invitees may, in all material respects, be identical with the nature of the duty
of the master to use reasonable care to provide his servant with a reasonably safe
place to work . . . .” 280 S.W.2d 238, 240 (1955). However, the supreme court
explicitly qualified this statement by noting that “[t]he two fields of law (landowner-invitee and master-servant), are entirely separate, and they should be kept so.” Id. 
Thus, Sears does not support the panel’s and the Fourteenth Court’s conclusions that
a Timberwalk analysis applies in either case.
          More importantly, the Timberwalk analysis is simply not applicable in the
instant case.


 In Timberwalk, the supreme court was concerned with the issue of
foreseeability in the context of the complaint that a landowner had negligently failed
to provide adequate security at an apartment complex to protect a tenant from the
sexual assault of a third person. 972 S.W.2d at 751. The court noted that the
plaintiff’s claim was a premises liability claim, not a negligent activity claim, because 
the case concerned the alleged “failure to use ordinary care to reduce or eliminate an
unreasonable risk of harm created by a premises condition” which the landowner
knew about or in the exercise or ordinary care should have known about. Id. at 753. 
Thus, the court noted that a landowner owes a duty to use ordinary care to protect an
invitee from the criminal acts of third parties “only when the risk of criminal conduct
is so great that it both unreasonable and foreseeable.” Id. at 756. 
          Here, Barton’s complaint simply does not concern a premises condition, and
the Timberwalk factors to determine whether an occurrence of certain criminal
conduct at the Whatabuger restaurant was foreseeable are not applicable. Barton is
not complaining that Whataburger failed to use ordinary care to protect her son from
some random act of violence committed by an unknown third party who happened to
show up at the restaurant. Rather, Barton specifically complains that a Whatabuger
night-time manager, who had previously been convicted of selling narcotics, actually
planned the robbery that resulted in the death of her son. A plaintiff in Barton’s
position will not be able to establish the Timberwalk factors because her claims are
based not upon a premises defect, but, rather, upon the negligent acts and omissions
of an employer.  
          Likewise, Barton is not complaining of “the diabolic conduct” and the random
violent act of some strange third party. Her complaint is focused on Whatabuger’s
negligent acts and omissions in hiring Love and then placing him in a management
position in which he had responsibility over and for her son. As a Whatabuger night-time manager, Love most certainly should not have conspired with Marshal and then
placed Dean in Marshall’s path of destruction and death. Marshall did not pick the
Whataburger restaurant at random. Rather, Marshall attempted to rob the
Whataburger restaurant because the Whataburger night-time manager solicited him
to do so. 
          Accordingly, the panel’s holdings that Barton failed to raise a fact issue on the
Timberwalk factors and that the conduct of Marshall was a superseding cause of
Dean’s death unforeseeable to Whataburger are in serious error. See Tex. R. App. P.
41.2(c).
Conclusion
          In sum, I would hold that the trial court erred in granting summary judgment 
in favor of Whataburger on the issue of forseeability, and this Court should reverse
the trial court’s judgment and remand for further proceedings. At the very least,
Barton’s evidence raises a fact question on the issue of foreseeability. In concluding
otherwise, the panel erroneously characterizes the inherent relationship between
narcotics dealers and violent crime as “stereotypical” and erroneously conflates the
duties owed by premises owners with the duties of employers to their employees
resulting in a serious error. Accordingly, I respectfully dissent from the denial of en
banc reconsideration. See id.
 
 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Chief Justice Radack and Justices Alcala and Bland.
 
Appellant moved for en banc consideration. See Tex. R. App. P. 41.2(c). 
 
A majority of the Court voted to deny en banc consideration. See Tex. R. App. P.
49.7.
 
The en banc court consists of Chief Justice Radack and Justices Taft, Jennings,
Keyes, Alcala, Hanks, Higley, Bland and Sharp. 
 
Justice Jennings, dissenting to the denial of en banc consideration, joined by Justices
Keyes and Sharp. 
 
Justice Keyes, dissenting to the denial of en banc consideration, joined by Justice
Sharp.