In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-23-00234-CR

**JACORY BLUE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F21-36414**

**MEMORANDUM OPINION**

Ron Guillory died from a gunshot wound he received on November 16, 2020.

A grand jury indicted Appellant Jacory Blue (Blue) for "intentionally and knowingly

caus[ing] the death of an individual, namely: Ron Guillory, [] the Complainant, by

shooting Complainant with a deadly weapon, to-wit: a firearm[.]"[1] Blue pleaded "not

---

[1] The State's theory of prosecution, as evidenced by the jury charge, was that
Blue and DeMarcus Powell were engaged in a criminal conspiracy to commit
aggravated robbery against Guillory, and that in furtherance of that aggravated
robbery, Powell committed the offense of murder by shooting Guillory with a

guilty," and a jury found Blue guilty of murder and assessed punishment at twenty years of imprisonment. Blue timely filed a notice of appeal. In one issue, Blue challenges the sufficiency of the evidence supporting the jury's verdict. We affirm.

## Evidence at Trial

Testimony of "Larry"[2]

"Larry" testified that on November 16, 2020, he received a text from a number that he did not recognize, and he conversed through text messages with someone he believed to be a female. According to Larry, she texted him a photograph of herself, and after they texted for a while, the texts turned sexual in nature. When he left work that night, she texted him, they agreed to meet at an apartment, and she agreed that she would have sex with him for $100. He drove to the apartment complex where she told him to meet at an apartment, and in the parking lot he became uneasy because of the surroundings. Despite feeling uneasy, he approached the second-floor apartment unit, and when he saw that the apartment had no lights, no blinds, and no sound coming from it, he became suspicious and started down the stairs to leave.

---

firearm, and Blue should have reasonably anticipated the offense would result as a consequence of carrying out the conspiracy to commit the aggravated robbery. A trial court may charge the jury on the law of parties even though there is no such allegation in the indictment. *See Marable v. State*, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002) ("[I]t is well-settled that the law of parties need not be pled in the indictment.").

[2] "Larry" is a pseudonym. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2

Larry testified that when he was coming down the stairs, a man with a gorilla mask on his face put a gun to Larry's head and made him get on the ground, and a man wearing a red bandana over his face ran up and started patting him down to see what he had in his pockets. The man in the gorilla mask threatened Larry if he moved and then took Larry's phone. According to Larry, the man wearing the red bandana took Larry's keys, and Larry lied and convinced them that they were his house keys and told them that he did not have a car there. The men also took $101 from Larry. When the men were distracted, Larry escaped and ran and hid in different spots around the apartments until he could make it to his car and call the police.

Larry testified that he initially told the police that he was driving through the area and that two suspects jumped in front of his car and robbed him. According to Larry, he told police this initially because he was married, and he did not want anyone to know why he was going to the apartment. He later provided a second statement and told the police what had actually occurred. Larry testified that he was unable to identify the two men that robbed him because they had their faces covered, but the police recovered his money and phone and returned them to him. Larry identified a gorilla mask marked as State's Exhibit 106 and a red bandana marked as State's Exhibit 107 as items like the ones worn by the men who robbed him.

Testimony of "Brenda"[3]

"Brenda" testified that she lived in Apartment 336, a ground floor apartment at the Timberlake Courts apartment complex with her two young adult sons and fifteen-year-old daughter, and they were home at the time of the shooting on November 16, 2020. According to Brenda, she was lying on the sofa by the window in the living room by the front door, it was in "the middle of the night," when she heard someone walking outside by the window stop and yell, "Get out of my face with that bull[#$&@]." Brenda testified she heard three or four gunshots outside the window and then "it got quiet after that." According to Brenda she and her children were scared, and she called 911. Law enforcement arrived and talked to them at their apartment. A recording of the 911 call was played for the jury and admitted into evidence. According to Brenda, her children told her the voice they heard outside the window that night sounded like Blue's voice. Brenda identified Blue at trial as someone who "was always at that apartment on top in the corner[]" of the same apartment complex. Brenda testified that the police went that night to the apartment where Blue had been staying.

According to Brenda, two or three days before the shooting she was cleaning and noticed that the Smith & Wesson nine-millimeter gun that she kept in a box on her closet shelf was missing. Brenda testified that the gun was "brand new[,]" had

---

[3] "Brenda" is a pseudonym. *See* Tex. Const. art. I, § 30(a)(1).

bullets loaded in the gun's magazine, she had never used the gun, and she had purchased it from Academy. An Academy receipt from the purchase of the gun was admitted into evidence, and Brenda testified that the serial number on the receipt for the gun matched the serial number of the gun admitted into evidence as State's Exhibit 2.

According to Brenda, when she discovered the gun was missing, she asked her children about it and "they didn't say anything." Brenda testified that after the shooting, her oldest son, Charles, told her that prior to the shooting he had taken her gun outside for safety because "robbing was going on[,]" and DeMarcus Powell took the gun from him and told him that if he told anyone in the house about it that Powell would kill everyone in Charles's home.

Testimony of "Charles"[4]

"Charles," Brenda's son, testified he was staying at his mother's two-bedroom apartment on the night of the shooting, and he was staying in the first bedroom which was closest to the sidewalk, and his bedroom window faced the sidewalk. According to Charles, around midnight on the night of the shooting, he was in bed. He testified he heard Blue outside his window aggressively say, "Get that #&$@ out of my face[,]" and then Charles heard gunshots. At trial, Charles identified Blue as the defendant, and he explained that he had recognized Blue's voice on the night of the

---

[4] "Charles" is a pseudonym. *See* Tex. Const. art. I, § 30(a)(1).

5

shooting because over the month or two that Charles had been staying at his mother's apartment, he passed Blue and Powell on a regular basis when they were "hanging out" in the stairwell near his mother's apartment, where he occasionally spoke to them. Charles testified that after he heard the gunshots, he turned his lights off, got down on the ground, told his mother to call 911, and while she was talking to 911, he told her that it sounded like Blue's and Powell's voices were outside the window.

According to Charles, when his mother was at work, he put his mother's gun in his closet because he did not trust the area and he felt he needed to protect his little sister and little brother. When police initially questioned Charles about his mother's missing gun, he did not tell the police who took the gun, and instead he told them someone knocked on his door and he went outside to see who it was, and someone took the gun when he left the gun on the back of his car.

Charles testified that subsequently he told the police what really happened to the gun, and that that the gun had been stolen by Powell. When Charles corrected his statement to the police about the gun, according to Charles, he told the police that someone "knocked on [his] door banging and just took off[,]" and to protect himself because the neighborhood was dangerous, he put his mother's unloaded gun in one of his pockets and the magazine for the gun in the other pocket, and he stepped outside. He saw Powell sitting outside and asked him if he had seen anyone knock on the door, and Powell said, "No." He spoke with Powell for a few minutes and had

6

his hand in his pocket on the gun because he "already d[id]n't trust the area[.]" Powell asked him what was in his pocket, told him to "[p]ull it out right now." Powell then pulled out his own gun from his own pocket, and Powell told Charles to give him the gun. After Powell got the gun, he asked Charles for the magazine, which Charles gave him. Then (according to Charles) Powell said: "If you tell anybody I took this, I'm going to come kill y'all."

Testimony of "Michelle"[5]

"Michelle," Charles's sister and Brenda's daughter, testified that on the night of the shooting she was sixteen years old and had just finished washing dishes in the kitchen. She heard who she thought was Powell outside say, "get the f[#$&] out of my face with that bull[#$&@][,]" and she heard about eight gunshots outside her brother's window. She was scared, her brother came out of his room, and their mother told them to get down because she did not want them to get hurt. Michelle testified that she peeked out the window when the police arrived and saw crime scene tape and the police. According to Michelle, she remembered that the police knocked on the door and checked on her family, and the next morning law enforcement called, and she went to talk to them. Michelle testified that she told law enforcement initially that she thought the voice she had heard outside was Blue's and not Powell's.

---

[5] "Michelle" is a pseudonym. *See* Tex. Const. art. I, § 30(a)(1).

7

Testimony of Officer Bryan Martin

Officer Bryan Martin with the Beaumont Police Department testified that he was dispatched to the apartment complex in response to a report that shots had been fired. He arrived right after midnight and discovered that Ron Guillory was deceased in the parking lot, and that Guillory had been shot. Officer Martin found a small revolver, shell casings, and a cell phone next to Guillory's body. According to Officer Martin, he spoke with the occupants of Apartment 336, who had called 911. The occupants told Martin that they believed based on the voices and subsequent gunshots they heard that the individuals involved were right outside their door, but Officer Martin testified that "[g]unshots can be loud, and in that courtyard it can echo fairly well." According to Officer Martin, none of the occupants in Apartment 336 initially reported that the person's voice they heard was Blue. Officer Martin testified that while he was investigating at the scene, he learned through dispatch that a man had been robbed at the same complex a few minutes before by two people, one wearing a gorilla mask and the other a red bandana, but Martin did not know whether the robbery was related to the shooting. While Officer Martin was providing security at the scene, other officers followed a trail of blood police found on the scene while another officer went to speak with the victim of the robbery, whose phone was still "pinging" its location to the apartment complex. The video recording

8

from Officer Martin's body camera from that night was admitted into evidence and published to the jury.

Testimony of Officer Joshua Beard

Officer Joshua Beard with the Beaumont Police Department testified that he was dispatched to the Timberlake Courts Apartments on the night of the shooting. He observed Guillory's body with multiple gunshot wounds to the upper torso, including one gunshot wound to the center chest. A cell phone, nine-millimeter shell casings, and a small derringer gun were found near the victim's body, and the body was outside near a breezeway and sidewalk. According to Officer Beard, a derringer is a revolver, and any rounds fired on it would remain inside the derringer cylinder. Officer Beard testified that he noticed a trail of fresh blood that he did not believe came from Guillory, which appeared to be directed away from the body rather than toward where the victim had fallen. Officer Beard testified that, based on his experience, he believed the pattern of the blood indicated that the person who was bleeding had moved away from the victim's body. Officer Beard testified that he believed, based on the nine-millimeter shell casings found near the body and the blood trail leading away from the body, that the shooter might still be armed with a gun and could need emergency treatment. According to Officer Beard, he followed the blood trail into the courtyard of the complex, to the opposite breezeway, and up the stairs where the trail of blood ended at the door of apartment 440. Officer Beard

9

testified that during this time he received information that an individual had been robbed earlier near the complex and that one of the suspects had worn a gorilla mask and the other suspect had worn a red bandana. A video recording of Officer Beard's body camera from that night was admitted into evidence and published to the jury.

According to Officer Beard, Powell came out of apartment 440, and when Beard asked if anyone else was inside, Powell stated that only he and his girlfriend were inside. Powell's girlfriend, Zoey, exited the apartment, and, from the outside of the apartment, Officer Beard looked for people inside the apartment and noticed a gorilla mask inside the apartment on the floor. Officer Beard testified that the gorilla mask he saw inside the apartment looked like State's Exhibit 106. Officer Beard explained that when he saw the mask on the night the shooting occurred, he then had reason to believe that the previously reported robbery in the apartment complex was related to the shooting. Although Powell initially told Officer Beard that only he and his girlfriend were at the apartment, Mia Moore and Jacory Blue, who were inside apartment 440, also came out of the apartment, according to Officer Beard. Officer Beard testified that when he saw Blue that night, Blue had blood on his face. At trial, Beard identified Blue as the defendant.

Testimony of Mia Moore

Mia Moore testified that on the night of the shooting she was either sixteen or seventeen years old. According to Moore, at the time of the shooting she was dating

10

Blue and had met him through a dating app. Moore testified that on the night of the shooting, she went to Blue's apartment in the Timberlake apartment complex around 10:30 p.m. Moore testified that Blue typically stayed in the bedroom at the back of the one-bedroom apartment and that other people normally stayed towards the front of the apartment, but she did not know them, and she would usually stay in the back of the apartment with Blue.

Moore testified that on the night of the shooting, Blue arrived at the apartment a couple of minutes after she did. Blue and Powell arrived and talked to her about "getting weed[]" and Blue left the bedroom where Moore was and then returned and handed her his phone and asked her to tell the person on the phone to be at a specific location at the apartment complex. Although Moore did not know the person on the phone and only gave the location and did not specifically talk about weed, she testified that Blue was supposed to meet the person to get the weed and then go to the store. Moore testified she was intoxicated and high that night, and that she was "not really paying attention to [Blue and Powell.]"

According to Moore, Blue and Powell left the apartment, and within ten minutes of them leaving, she heard three gunshots outside, and seconds later Powell came running into the bedroom startled. Moore testified that Blue came running into the bedroom a few seconds later and said, "I've been shot." Moore did not recall that either one of them were holding a weapon or holding or wearing a mask. But Moore

11

testified that she did remember seeing a gorilla mask on the floor of the apartment. She also testified she never saw Blue with a red bandana. According to Moore, Blue had been shot in the mouth, there "was blood everywhere[,]" and he went into the bathroom and fell on the floor. Moore testified that while she was leaning over Blue in the bathroom asking him if he was okay, Powell admitted to killing someone and said, "You better not tell nobody I took that body for you." Moore explained that when she suggested calling the police "[e]verybody just looked appalled and . . . shocked." And she said that when she was consoling Blue in the bathroom, Powell stepped out of the bathroom, and she did not know what he was doing. According to Moore, the police then knocked at the door, and everyone went to the bedroom and pretended to be sleeping. Moore testified that Powell answered the door after the police knocked over twenty times and announced that they were going to open the door. Moore testified that law enforcement escorted Powell and his girlfriend out, Blue exited, and then Moore.

According to Moore, after that night she never contacted Blue to talk about the incident. Moore testified that she never saw Blue or Powell with a weapon. Moore said she later learned through police that a gun was found in the apartment.

Testimony of Zoey Tate

Zoey Tate testified that on November 16, 2020, she was probably seventeen years old and that she had been dating Powell for about three or four months.

According to Tate, she lived with her grandmother, and she would often go to Powell's apartment where he lived with Blue and where the police came the night of the shooting occurred. Although she testified that she only knew Blue from the apartment and did not know him well, she identified him at trial. Tate testified that Powell was not friends with Blue and "didn't like him" and only talked to him from time to time even though Powell and Blue stayed in the apartment together.

Tate testified that she arrived at the apartment on the night of the shooting about 5 or 6 p.m., and she fell asleep there after taking a Xanax. She heard police at the door and went back to sleep. The police were banging on the apartment door, and she woke up again and she and Powell exited the apartment. Tate testified that Powell was arrested but she was not. She saw Powell a day or two later, when she bonded him out of jail, and he left the jail with her. According to Tate, she and Powell had items back at Powell's apartment they needed to get, so they returned to Powell's apartment to retrieve their belongings, but she did not see what Powell retrieved and did not see him with any type of weapon. Tate testified that prior to the shooting she had seen Powell a couple of times with a gun, but she did not know what kind of gun it was because she was not familiar with guns.

Tate testified that she and Powell went to her grandmother's house where they sat in the car most of the night, and Powell told Tate that he was upset that Blue had asked to borrow Powell's gun and that instead of letting him borrow his gun, Powell

13

went with Blue to rob a man. Tate testified that Powell told her that when he and Blue met up with the man they had planned on robbing, the man started shooting at them and Powell admitted he shot and killed the man they were robbing after the man shot Blue. According to Tate, Powell did not tell her what he did with the gun, and she did not know where the gun was, but she later learned that Powell had left the gun at Tate's grandmother's house. Tate testified that on the day Powell went to talk to the detectives about getting his phone back, Tate's grandmother found the gun when she went in Tate's room after Powell had stayed there the night before, and Tate's grandmother was concerned because Powell had just gotten out of jail. Tate testified that her grandmother took the gun she found to Tate's great-grandmother's residence. Tate believed the gun was Powell's because she had seen Powell with a gun before, neither she nor her grandmother had a gun, and the only other person that had been in Tate's room was Powell.

Testimony of Michelle Ceja

Michelle Ceja, a crime scene technician with the Beaumont Police Department, testified that she was dispatched to the scene on the night of the shooting. According to Ceja, when she arrived, she spoke with the officers and detectives about any potential evidence, and she was directed to the deceased. Ceja testified that she took photographs of the deceased and other evidence at the scene to document what was there. Ceja testified that a small .22 caliber derringer pistol

14

was found next to the victim. Ceja testified that she observed the deceased had five gunshot wounds. Ceja explained that she marked the locations of and photographed shell casings near the victim, and she identified two other casings that were found further away from the victim's body as State's Exhibits 235 and 236. Ceja testified she collected the shell casings from the scene, and she identified the shell casings at trial as State's Exhibits 232 through 234. At trial, she identified the gun found near Guillory as State's Exhibit 105-A, the chamber from the gun as State's Exhibit 105-B, the live rounds removed from the gun as State's Exhibit 105-C, and the items were admitted into evidence. Ceja testified that she documented and photographed items on the deceased's person and that those items were condoms, lubricant, a $100 bill and several $1 bills, a credit or debit card, and a cell phone. She also documented and photographed a trail of what appeared to be blood on the same breezeway of the deceased, she observed more blood along the opposite breezeway from the victim, and that the blood spots continued up the stairs and to the second-floor apartment, apartment 440. Photographs of the blood trail were admitted into evidence.

Ceja testified that later that night she photographed Blue at the Beaumont police station, and those photographs were admitted into evidence and published to the jury. According to Ceja, the photographs depicted Blue with blood on his face, teeth missing, and an open wound on his face. She testified that she also documented what appeared to be blood on Blue's hands.

15

Testimony of Chris Davis

Chris Davis, a crime scene supervisor with the Beaumont Police Department, testified that he responded to the crime scene on November 16, 2020, at about 2 a.m. According to Davis, when he arrived at the scene, Ceja had already started photographing and marking evidence with cones, so Davis said he walked the scene and videotaped the area. He explained that he also assisted other detectives with executing a search warrant later that morning at apartment 440 and that he took photographs and documented the evidence that he collected when he executed the warrant.

Davis identified State's Exhibit 106 as a gorilla mask and State's Exhibit 283 as a red bandana, both items he observed and photographed inside apartment 440, and Davis stated the items were collected from the apartment. According to Davis, he also photographed a Kahr MK9 nine-millimeter pistol with a serial number GC2799 with two live rounds inside that was found underneath a chair cushion and two cell phones found in the apartment, which were all collected as evidence. At trial, he identified State's Exhibit 315 as the Kahr nine-millimeter pistol he collected from the apartment that was taken to the crime lab. Davis testified that he photographed possible blood spots in the apartment, as well as money and a jar with a green leafy substance found inside the apartment.

According to Davis, a few days later, on November 18, 2020, he was called in this case to meet Detective Spikes to photograph and retrieve a gun at a different location, Apartment 112 at 2250 West Virginia. Davis testified he photographed a Smith & Wesson SD9VE firearm with serial number FCK3518 and that he identified State's Exhibit 2 as that firearm. He also photographed the rounds that were inside the firearm's magazine. Davis testified he transported the firearm to the Crime Lab that same day.

Testimony of Detective Phillip Smith

Detective Phillip Smith with the Beaumont Police Department testified that during his work on Blue's case, he picked up a bullet from the morgue, which had been removed from Guillory's body during the autopsy. Detective Smith testified that he transported the bullet to the Jefferson County Crime Lab. State's Exhibit 342, the bullet that the detective identified as the bullet he picked up and took to the Crime Lab, was admitted into evidence. According to Detective Smith, he also assisted in preparing and executing a search warrant for apartment 440 at the Timberlake Courts apartment complex, and he was present when a weapon was found inside apartment 440 underneath a couch cushion, and he was present when a phone was found during the search of the apartment in the same room.

Testimony of Hunter Jones

Hunter Jones, a forensic scientist, firearms examiner, and ballistics expert with the Jefferson County Crime Lab, testified that on November 16, 2020, the Crime Lab received evidence in Blue's case, and that he examined those items that day. Jones testified that as part of Blue's case he analyzed Exhibits 232 through 236, which were fired cartridge casings from the crime scene. According to Jones, he was tasked with comparing the casings with each other and with two firearms, State's Exhibits 2 and 315, that were also submitted to the lab. Jones testified that he determined that all the shell casings were excluded from being fired from Exhibit 315, a Karh's MK9 firearm. He testified that he determined that the shell casings identified as Exhibits 232, 233, and 234 were fired from Exhibit 2, a Smith & Wesson. He also determined that State's Exhibit 342, the bullet from Guillory's autopsy, had been fired from State's Exhibit 2, the Smith & Wesson firearm. He concluded that the shell casings admitted as 235 and 236 were fired from the same firearm, but not from State's Exhibits 2 or 315. According to Jones, he detected possible blood on the slide of the Karh firearm, State's Exhibit 315, and swabbed it and sealed the swab as State's Exhibit 343 for testing by the serology section of the crime lab. State's Exhibit 343 was admitted into evidence.

Testimony of Steven Mayes

Steven Mayes, a forensic scientist with the Jefferson County Regional Crime Lab, testified that he analyzed State's Exhibit 343, the swab taken from the slide of the Karh firearm, for potential blood. He testified that the swab tested positive for blood on the presumptive and confirmatory tests he conducted. According to Mayes, his lab does not test blood for DNA, so once he confirmed the swab was blood, the Crime Lab sent the swab to the DPS lab in Houston for DNA testing on November 29, 2020. Mayes testified that later, on January 22, 2021, Detective Timothy Spikes with the Beaumont Police Department delivered State's Exhibit 345 to the crime lab, an exhibit that contained buccal swabs from the inside of Blue's cheek. Mayes explained that he submitted that DNA sample to the DPS for testing.

Testimony of Timothy Spikes

Officer Timothy Spikes, a detective with the Beaumont Police Department at the time of the murder but a patrol officer for the same department at the time of trial, testified that he responded to the scene and was assigned as lead detective. Officer Spikes testified that DeMarcus Powell admitted that he shot the victim in this case. Officer Spikes testified that he also obtained a search warrant in January of 2021 for a buccal swab on Jacory Blue, whom he identified at trial as the defendant. Officer Spikes testified that the purpose of the warrant was to obtain Blue's DNA to compare it to items at the crime scene. According to Officer Spikes,

19

he obtained two buccal swabs from the inside of Blue's mouth, and Officer Spikes identified those swabs as State's Exhibit 345. Officer Spikes testified that he secured the buccal swabs in a sealed envelope and submitted them for testing to the Jefferson County Crime Lab.

Testimony of Mary Ralston

Mary Ralston, a forensic scientist for the Texas Department of Public Safety Crime Laboratory in Houston, identified State's Exhibit 343 as an envelope containing a general swab which is marked "swab from slide." The swab inside has a light-red brown stain, and the material on the swab had already been confirmed as blood by another laboratory before it was sent to the DPS Crime Lab in Houston. According to Ralston, on December 8, 2020, she began her analysis on the blood swab, and she submitted a portion of the swab for DNA testing. She identified State's Exhibit 345 as an envelope with Blue's buccal swabs and testified the exhibit was received by her lab on January 29, 2021. According to Ralston she began her analysis on the material in Exhibit 345 on February 2, 2021, when she submitted a portion of a swab in the exhibit for DNA testing.

Testimony of Kerri Todd

Kerri Todd, a forensic scientist for the Texas Department of Public Safety, testified that she compared the DNA extract from the swab of the slide (State's

Exhibit 343) with the DNA extract of the buccal swab from Jacory Blue. As to her findings, she testified as follows:

> For the DNA extract from the slide - - from the swab of the slide from the crime scene, the result was that the previously obtained DNA profile from this item is interpreted as a mixture of three individuals. The probability of obtaining this mixture profile if the DNA came from Jacory Blue and two unrelated unknown individuals is 29 septillion times greater than the probability of obtaining a profile if the DNA came from three unrelated, unknown individuals.
> This likelihood ratio indicates support for the proposition that Jacory Blue is a possible contributor to the profile.

Todd testified that Blue could not be excluded as a contributor of the blood from the swab of the slide.

Testimony of Dr. Amy Murphy

Dr. Amy Murphy, who performed Ron Guillory's autopsy on November 19, 2020, testified through Zoom. Dr. Murphy testified that at the time of trial she was working out of town. According to Dr. Murphy, Guillory suffered from five gunshot wounds, his cause of death was "penetrating and perforating gunshot wounds of the torso[,]" and his manner of death was a homicide. Photographs and Dr. Murphy's report from the autopsy were admitted into evidence.

Testimony of Guillory's Sister

Guillory's sister identified her brother, Ron Guillory, as the murder victim.

## Challenge to the Sufficiency of the Evidence

On appeal, Appellant challenges the sufficiency of the evidence to support his conviction. Appellant argues that the evidence clearly established that Powell, and not Appellant, shot Guillory and that Guillory's cause of death was from gunshot wounds inflicted by Powell. According to Appellant, the record is insufficient to support that he was a party to the offense or that he participated in any act with an anticipation that Guillory's death would occur. Appellant also argues that he had no specific intent to kill Guillory, and that the evidence established that he did not know Guillory had been shot "until the actual killer Powell told him that he 'took a body for [him,]'" and that Blue's conviction "rests entirely upon speculation[.]"

We review the sufficiency of the evidence in the light most favorable to the verdict to determine whether a rational fact-finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the fact-finder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the fact-finder resolved such conflicts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App.

22

2007). While a jury is permitted to draw reasonable inferences from the evidence, it is not permitted to draw conclusions based on speculation or factually unsupported inferences or presumptions. *See Hooper*, 214 S.W.3d at 15. The jury as fact-finder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995).

We also "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 16-17). "Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359-60 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

A person commits murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). "Murder is a 'result of

23

conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death." *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. Tex. Penal Code Ann. § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a); *Adames v. State*, 353 S.W.3d 854, 862 (Tex. Crim. App. 2011). Culpability under the law of parties does not distinguish between principals or accomplices. *See* Tex. Penal Code Ann. § 7.01(c). A person is criminally responsible for an offense committed by the conduct of another if "acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" *Id.* § 7.02(a)(2); *Adames*, 353 S.W.3d at 862.

"'Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement.'" *Salinas v. State*, 163 S.W.3d 734, 739 (Tex. Crim. App. 2005) (quoting *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim.

24

App. 1994)). Party participation may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act. *Id.* at 739-40.

The jury charge instructed the jury that, in order to find Blue guilty, the jury must agree on the following elements beyond a reasonable doubt:

> . . . that Defendant, Jacory Blue engaged in an attempt to carry out a conspiracy with Demarcus Powell to commit Aggravated Robbery; and in that conspiracy attempt Demarcus Powell committed Murder, by intentionally or knowingly causing the death of Ron Guillory, by shooting Ron Guillory with a deadly weapon, to-wit: a firearm; and the Murder was committed in furtherance of the said conspiracy to commit Aggravated Robbery; and the Defendant, though having no intent to commit Murder, should have anticipated that the Murder would result from carrying out the conspiracy to commit Aggravated Robbery[.]

A criminal conspiracy arises when multiple people agree to commit an offense and "one or more of them performs an overt act in pursuance of the agreement." Tex. Penal Code Ann. § 15.02(a)(2). The Texas Penal Code also provides that

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the offense actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* § 7.02(b).

For a defendant to be found guilty as a party to the secondary offense (here, murder), the jury must determine that the secondary offense was committed in

25

furtherance of the unlawful purpose of the conspiracy (here, aggravated robbery) and was one that the co-conspirators should have anticipated as a potential result of carrying out that conspiracy. *Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013) (finding that the question before an appellate court is whether it was rational for the jury to infer that the accused should have anticipated that the secondary offense would occur as a result of the primary offense). The State is not required to prove that the defendant actually anticipated the commission of the secondary offense, "only that the crime is one that *should* have been anticipated." *Id.* (emphasis in original). So, if in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. Tex. Penal Code Ann. § 7.02(b); *Garcia v. State*, No. 05-22-00526-CR, 2023 Tex. App. LEXIS 5429, at **4-16 (Tex. App.—Dallas, July 25, 2023, no pet.) (mem. op., not designated for publication).

A person commits the offense of robbery if, in the course of committing theft, and with intent to obtain and maintain control the property of another, he either (1) intentionally, knowingly, or recklessly causes bodily injury to another, or (2) intentionally or knowingly threatens or places another in fear of imminent bodily

26

injury or death. Tex. Penal Code Ann. § 29.02(a)(1), (a)(2). A person commits the offense of aggravated robbery if he commits the offense of robbery, and he uses or exhibits a deadly weapon in the course of committing that offense. *Id.* § 29.03(a)(2). A deadly weapon is defined as "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury[.]" *Id.* § 1.07(a)(17)(A).

On this record, the jury could have reasonably inferred that Guillory was lured to the complex by Blue and Powell so they could commit an aggravated robbery of Guillory. The robbery scheme was similar to what Larry described when he was lured to the apartments and then robbed by a man in a gorilla mask and a man with a bandana, that same night. The jury heard Larry's testimony describing the robbery. The jury also heard Moore's testimony that on the night of Guillory's murder she saw a gorilla mask on the floor of the apartment where Powell and Blue were staying at Timberlake Courts, and photographs were introduced into evidence showing a gorilla mask on the floor of the apartment where Powell and Blue lived. The jury could have reasonably inferred from the evidence that Powell and Blue were armed and planned to rob Guillory, just like they had robbed Larry, and when they attempted to do so, Guillory pulled his own gun (a derringer) to defend himself. Testimony from Brenda, Charles, and Michelle confirmed that they heard Blue tell someone at the time of the shooting to get the gun out of Blue's face, and the

27

evidence showed that Guillory shot Blue in the face, and Powell shot Guillory. The jury heard Tate's testimony that Powell hid a gun at her grandmother's house and heard testimony that the gun had the same serial number as the gun Powell had stolen from Charles. The jury heard testimony that another weapon was found in a chair cushion after the shooting in the apartment where Powell and Blue were staying. The jury heard evidence that Powell and Blue ran back to the apartment and pretended to be asleep after the shooting until police knocked on the apartment door, and the jury heard Blue's girlfriend testify that Powell and Blue did not want her to call the police after Blue was injured. The jury heard evidence that Powell admitted to shooting Guillory during the attempted robbery.

Evidence that a defendant knew his co-conspirator might use a gun during a robbery can be sufficient to demonstrate that the defendant should have anticipated the possibility of a murder occurring during the course of the robbery. *See Fisher v. State*, No. 09-11-00379-CR, 2012 Tex. App. LEXIS 9218, at **39-40 (Tex. App.— Beaumont Nov. 7, 2012, no pet.) (mem. op., not designated for publication) (citing *Love v. State*, 199 S.W.3d 447, 453 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *Longoria v. State*, 154 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (holding appellant's providing his associate with a gun for use in the robbery was sufficient to support the jury's conclusion that victim's death should have been anticipated as a result of the robbery)); *see also Fuller v. State*, 827

S.W.2d 919, 932 (Tex. Crim. App. 1992) (holding that murder should have been anticipated as a possible result of a robbery when, although appellant denied participating in any brutality against decedent, he admitted to having a pocketknife with him at the time of entry and that one of his cohorts usually would have had a knife in that situation); *Green v. State*, 682 S.W.2d 271, 285-86 (Tex. Crim. App. 1984) (murder should have been anticipated as a possible result of a robbery when appellant admitted entering the house armed with a gun); *Smith v. State*, 187 S.W.3d 186, 190-92 (Tex. App.—Fort Worth 2006, pet. ref'd) (there was sufficient evidence to support capital murder conviction under law of the parties when appellant participated in robbery but was not the shooter).

Even if Blue did not intend for Powell to shoot Guillory during the robbery, a reasonable jury could have concluded that Blue should have anticipated that a murder was possible. The jury heard testimony that allowed them to reasonably conclude that because Powell and Blue were each armed with a firearm when they attempted to rob Guillory indicated that Blue was aware of the dangerousness of the robbery. Based on the evidence, the jury could have reasonably concluded that Blue anticipated, or should have anticipated, the possibility that Powell may shoot Guillory during the course of the robbery. *See* Tex. Penal Code Ann. § 7.02(b); *Anderson*, 416 S.W.3d at 888-89; *Fisher*, 2012 Tex. App. LEXIS 9218, at **35-40; *Love*, 199 S.W.3d at 453.

29

Blue aided or attempted to aid Powell in the commission of the offense of aggravated robbery, and he is also criminally responsible as a party to the offense of murder because, his co-conspirator, Powell, intentionally or knowingly caused Guillory's death in furtherance of the aggravated robbery and the murder was a result that Blue should have anticipated as a consequence of carrying out the conspiracy to commit the offense of aggravated robbery. Viewing all the evidence in the light most favorable to the jury's verdict, we conclude that the evidence is sufficient to support Blue's conviction under section 7.02(b) of the Texas Penal Code. *See* Tex. Penal Code Ann. § 7.02(b); *see also Anderson*, 416 S.W.3d at 888-89; *Fisher*, 2012 Tex. App. LEXIS 9218, at **35-40; *Love*, 199 S.W.3d at 453.

We overrule Blue's issue on appeal and affirm the judgment of the trial court.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on February 20, 2024
Opinion Delivered March 20, 2024
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.